**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MUKESH KUMAR, KESHAV KUMAR, DEVI LAAL, NIRANJAN, PAPPU, and BRAJENDRA, *on behalf of themselves and all others similarly situated*, | **COLLECTIVE AND CLASS ACTION COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| *Plaintiffs,* | Civ. Action No.: |
| *v.* | |
| BOCHASANWASI SHRI AKSHAR PURUSHOTTAM SWAMINARAYAN SANSTHA, INC., BAPS MERCER LLC, BAPS ROBBINSVILLE LLC, BAPS FELLOWSHIP SERVICES, INC., BHARAT DOE a/k/a BHARAT BHAI, PANKAJ PATEL, KANU PATEL, and SWAMI PRASANAND, | |
| *Defendants.* | |

Plaintiffs Mukesh Kumar, Keshav Kumar, Devi Laal, Niranjan, Pappu, and Brajendra, on behalf of themselves and all others similarly situated, by and through their attorneys Kakalec Law PLLC, Radford & Keebaugh, LLC, and Jaffe Glenn Law Group, P.A., as and for their Complaint, allege as follows:

Preliminary Statement

1.     This case is brought seeking redress for shocking violations of the most basic laws applicable to workers in this country, including laws prohibiting forced labor.  Plaintiffs Mukesh Kumar, Keshav Kumar, Devi Laal, Niranjan, Pappu,

Brajendra, and more than 200 other similarly situated Indian nationals (the "R-1 workers" or the "workers') were recruited in India to come to the United States with "R-1" religious visas to do stonework and other construction work in New Jersey.  There, they worked for Defendants Bochasanwasi Shri Akshar Purushottam Swaminarayan Sanstha, Inc. ("BAPS Swaminarayan Sanstha"), BAPS Mercer LLC ("BAPS Mercer"), BAPS Robbinsville LLC ("BAPS Robbinsville"), and BAPS Fellowship Services, Inc. ("BAPS Fellowship"), and Defendant individuals Bharat Doe a/k/a Bharat Bhai ("Bharat Bhai"), Pankaj Patel, Kanu Patel, and Swami Prasanand.  The workers spent years building, improving upon, and maintaining the BAPS Shri Swaminarayan Mandir (hereinafter "the temple") in Robbinsville, New Jersey, which news reports call the largest Hindu temple in the United States.

2.      Under United States immigration law, R-1 religious visas are available to members of the religious denomination sponsoring the visa holders, for those who minister or work in religious vocations or occupations.  Here, Defendants told the United States government that Plaintiffs and other R-1 workers were coming to the U.S. as religious "volunteers."   In reality, however, the Plaintiffs and other R-1 workers performed solely manual — not religious — labor for Defendants, nearly all were not members of Defendants' denomination, and they were not volunteers.

3.      Over a period of many years, Defendants required the Plaintiffs and the other R-1 workers to perform demanding work at the temple for more than 87 hours per week:  twelve and a half hours per day, seven days a week, with only a few days

off per year.   For these long and difficult hours of work, the workers were paid an astonishing $450 <u>per month</u>, and even less when Defendants took illegal deductions.  Their hourly pay rate came to approximately $1.20 per hour – well below the applicable federal and state minimum wages, and in fact even less than the federal minimum wage in effect as far back as 1963.

4.      Coming to the United States to perform labor as masons and construction workers – although presented by Defendant BAPS Swaminarayan Sanstha to the U.S. government as "religious workers" – Plaintiffs and the other R-1 workers, once here, were forced to live and work in a fenced, guarded compound which they were not allowed to leave unaccompanied by overseers affiliated with Defendants.  Defendants, through their agents, confiscated the workers' passports as soon as they left the airport at JFK upon the workers' arrival in the United States and kept those passports during the entirety of the workers' time in New Jersey to prevent the workers from leaving.  Security guards in BAPS uniforms were stationed at the temple premises where the workers lived and worked; cameras around the temple monitored and recorded the workers' activities.

5.      Workers were prohibited from speaking with outside visitors to the temple; failure to obey this rule would result in workers' meager pay being reduced even further, or the workers being sent back to India.   Supervisors told the workers that the police would arrest them if they left.  One R-1 worker, Moham Lal, died while he was subjected to forced labor at the temple, and the Defendants retaliated against other workers who organized to demand, among other things, that Moham Lal's

remains to be treated according to his — not the Defendants' — religious rituals and that the Defendants improve working conditions.

6.      The Defendants intentionally caused the workers to reasonably believe that if they tried to leave their work and the temple compound, they would suffer physical restraint and serious harm.  The Defendants also threatened the use of law or legal process to prevent the workers from leaving.

7.      Defendants intentionally recruited workers from the Scheduled Caste, also known as Dalit, and other marginalized communities in India.  People in the Scheduled Caste in India, for example, were formerly considered "untouchables" and "endure near complete social ostracization."[1]  At the temple in New Jersey, temple leadership did what they could to remind these marginalized workers of their place in the social hierarchy.  Defendant Swami Prasanand, for example, called the workers "worms," thus exacerbating the psychological coercion the workers experienced.

8.      Defendants' actions constitute forced labor, trafficking with respect to forced labor, document servitude, conspiracy, and confiscation of immigration documents in the course of and with the intent to engage in fraud in foreign labor contracting.  Based on this conduct, Plaintiffs here bring claims under the

---

[1]  Human Rights Watch, *Caste Discrimination: A Global Concern* (2001), https://www.hrw.org/reports/2001/globalcaste/caste0801-03.htm (last visited May 2, 2021); *see also* Prilali Sur, *Under India's caste system, Dalits are considered untouchable.  The coronavirus is intensifying that slur*, CNN.com (Apr. 16, 2020), https://www.cnn.com/2020/04/15/asia/india-coronavirus-lower-castes-hnk-intl/index.html (last visited May 2, 2021) ("Dalits are forced to take up the jobs such as cleaning, manual scavenging, working at brick kilns and leather-crafting -- occupations considered "filthy" or "dishonorable" for higher-caste communities.")

Trafficking Victims Protection Act ("TVPA").  Plaintiffs also bring claims under the Fair Labor Standards Act ("FLSA"), New Jersey wage and hour laws, and New Jersey common law for the massive underpayment of wages on behalf of themselves and other similarly-situated workers.

9.      Plaintiffs bring their TVPA and state wage claims, along with state common law claims for unjust enrichment and quantum meruit, as a class action pursuant to Fed. R. Civ. P. 23 on behalf of all non-supervisory R-1 workers who performed stonework and/or construction work on the temple grounds, and they bring their FLSA claim as a collective action pursuant to 29 U.S.C. 216(b) for unpaid wages and damages.

<u>Jurisdiction and Venue</u>

10.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C.  § 1337; 29 U.S.C. § 201 *et seq.* (the Fair Labor Standards Act); and 18 U.S.C. § 1595(a) (TVPA).

11.      The Court has jurisdiction over Plaintiffs' pendant state law claims under 28 U.S.C. § 1367 (supplemental jurisdiction).   Plaintiffs' state law claims are part of the same case or controversy as Plaintiffs' federal claims.

12.      Venue is proper in this district pursuant to 28 U.S.C. §1391.   A substantial part of the acts and/or omissions giving rise to the claims alleged in this Complaint occurred within this district.

13.      Defendants reside and/or do business in this district.

Parties

*Plaintiffs*

14.     Plaintiffs are Indian nationals who were recruited by Defendants and/or
        Defendants' agents to work in non-supervisory roles for Defendants as
        construction and/or stone workers under R-1 visas at the temple in Robbinsville,
        New Jersey at various times between May 11, 2011 and the present.

15.     Plaintiffs bring this case on behalf of themselves and all other similarly-situated
        who worked in non-supervisory roles as construction and/or stone workers under
        R-1 visas at the temple in Robbinsville.

16.     Plaintiff Mukesh Kumar is an Indian national and belongs to the Scheduled Caste,
        also known as Dalit.  He resides in Rajasthan, India.  Defendants (through their
        agents) recruited him in India to work at the temple in New Jersey.  He worked at
        the New Jersey temple from May 2018 through October 2020.

17.     Plaintiff Keshav Kumar is an Indian national and belongs to the Scheduled Caste,
        also known as  Dalit.  He resides  in Rajasthan, India.  Defendants (through their
        agents) recruited him in India to work at the temple in New Jersey.  He worked at
        the New Jersey temple from May 2018 through November 2018, and then again
        from April 2019 through October 2020.

18.     Plaintiff Devi Laal is an Indian national and belongs to the Scheduled Caste, also
        known as Dalit.  He resides in Rajasthan, India.  Defendants (through their agents)
        recruited him in India to work at the temple in New Jersey.  He worked at the
        New Jersey temple from May 2019 through September 2020.

19.    Plaintiff Niranjan is an Indian national and belongs to the Scheduled Caste, also
known as Dalit.  He resides in Rajasthan, India.  Defendants (through their agents)
recruited him in India to work at the temple in New Jersey.  He worked at the
New Jersey temple between May 2018 and November 2020.

20.    Plaintiff Niranjan also worked for one or more of the Defendants in New Jersey
between 2012 and 2014.

21.    Plaintiff Niranjan is named in this Complaint using his full legal name.  On his R-
1 visa, Niranjan is listed as Niranjan's surname, and  "FNU," meaning "first name
unknown," is listed for his given name.

22.    Plaintiff Pappu is an Indian national and belongs to the Scheduled Caste, also
known as Dalit.  He resides in Rajasthan, India.  Defendants (through their agents)
recruited him in India to work at the temple in New Jersey.  He worked at the
New Jersey temple between approximately April 2018 and November 2018, and
again between approximately May 2019 and October 2020.

23.    Plaintiff Pappu is named in this Complaint using his full legal name.

24.    Plaintiff Brajendra is an Indian national and belongs to the Scheduled Caste, also
known as  Dalit.  He resides in Rajasthan, India.  Defendants (through their
agents) recruited him in India to work at the temple in New Jersey.  He worked at
the New Jersey temple from May 2018 through October 2020.

25.    Plaintiff Brajendra is named in this Complaint using his full legal name.  On his
R-1 visa, Brajendra is listed as Brajendra's surname, and  "FNU," meaning "first
name unknown," is listed for his given name.

26. Plaintiffs Mukesh Kumar, Keshav Kumar, Devi Laal Niranjan, Pappu, and Brajendra consent to being party Plaintiffs in this action.   (*See* Exhibit 1, attached (consent forms for Keshav Kumar, Devi Laal Niranjan, Pappu, and Brajendra).)

*Entity Defendants*

27. Defendant Bochasanwasi Shri Akshar Purushottam Swaminarayan Sanstha, Inc. is a Delaware corporation registered to do business in New Jersey.  Its registered office is 81 Suttons Lane, Piscataway, NJ 08854-5723 and its registered alternative name is BAPS Swaminarayan Sanstha.

28. BAPS Swaminarayan Sanstha sought the approval for the Plaintiffs and the other R-1 workers to come to the United States to work at the temple.  BAPS Swaminarayan Sanstha's name is on visas obtained by the workers.

29. BAPS Mercer LLC is a New Jersey limited liability corporation with its business address at 81 Suttons Lane, Piscataway, NJ 08854-5723.

30. According to the Mercer (County) Property Information Portal, BAPS Mercer owns the property where the temple is located, which is at 112 North Main Street in Robbinsville, New Jersey (Mercer County).

31. BAPS Mercer was one of the entities which built the temple.

32. BAPS Mercer obtained state and local approvals and permits for the construction of the temple in Robbinsville.  Construction approved by the Mercer County Planning Board included modifying several temple building footprints, adding additional buildings and parking spaces, landscaping, and the installation of storm sewers and utilities.

33.    In addition, the Robbinsville Township Zoning Board adopted a resolution of approval allowing BAPS Mercer to construct an approximately 146,420 square foot building for storage, as a religious kitchen, and to receive deliveries at the same site.

34.    BAPS Robbinsville is a New Jersey limited liability company with its registered office at 81 Suttons Lane, Piscataway, NJ 08854-5723.

35.    Upon information and belief, BAPS Robbinsville owed at least part of the property where the temple was constructed, and participated in violations of the law at issue here.

36.     BAPS Fellowship is a  member or manager of BAPS Robbinsville.  Its address is also 81 Suttons Lane, Piscataway, NJ 08854-5723.

37.    Upon information and belief, BAPS Fellowship owed at least part of the property where the temple was constructed, and participated in violations of the law at issue here.

*Individual Defendants*

38.    Bharat Bhai is an employer and supervisor of R-1 workers at the temple and is an employer of the Plaintiffs and the R-1 workers.

39.    Upon information and belief, Bharat Bhai resides in the State of New Jersey.

40.    Pankaj Patel is an employer and supervisor of R-1 workers at the temple and is an employer of the Plaintiffs and the R-1 workers.

41.    Upon information and belief, Pankaj Patel resides in the State of New Jersey.

42.    Kanu Patel is an employer of the Plaintiffs and the R-1 workers, and supervised the workers, directly or indirectly.

43.    Kanu Patel facilitated the workers obtaining R-1 visas to work at the Robbinsville temple.

44.    Kanu Patel is the Chief Executive Officer of BAPS Swaminarayan Sanstha and is the registered agent and authorized representative for BAPS Mercer and BAPS Robbinsville.

45.    Upon information and belief, Kanu Patel resides in the State of New Jersey.

46.    Swami Prasanand is an employer and supervisor of R-1 workers at the temple and is an employer of the Plaintiffs and the R-1 workers.

47.    Upon information and belief, Swami Prasanand resides in the State of New Jersey.

48.    At all relevant times, Defendants were a "venture" within the scope of 18 U.S.C. § 1595(a).

49.    At all times relevant to this action, BAPS Swaminarayan Sanstha, BAPS Mercer, Bharat Bhai, Pankaj Patel, Kanu Patel and Swami Prasanand (the "Employer Defendants") jointly employed the Plaintiffs and other R-1 workers at the temple in Robbinsville.

50.    At all times relevant to this action, the Employer Defendants were "employers" of Plaintiffs and the other R-1 workers within the meaning of the FLSA and the New Jersey Wage & Hour and Wage Payment laws.

51.    At all times relevant to this action, Plaintiffs and the other R-1 workers were "employees" of the Employer Defendants within the meaning of the FLSA and the New Jersey Wage & Hour and Wage Payment laws.

52.   At all times relevant to this action, the Employer Defendants "employed" Plaintiffs and the other R-1 workers within the meaning of the FLSA and the New Jersey Wage & Hour and Wage Payment laws.

53.   Upon information and belief, Defendants were an enterprise engaged in commerce or in the production of goods for commerce, as defined by 29 U.S.C. § 203(s) in that they had "employees engaged in commerce or in the production of goods for commerce, or … [had] employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person," and they had "an annual gross volume of sales made or business done" of not less than $500,000.

54.   Upon information and belief, each of the Plaintiffs and the R-1 workers were individually engaged in commerce or in the production of goods for commerce.

Factual Allegations

*Recruitment of workers in India*

55.   Defendants utilized agents who were contractors and others to recruit Plaintiffs and the other R-1 workers to perform work in New Jersey.  Defendants' agents were connected with the network of Bochasanwasi Shri Akshar Purushottam Swaminarayan ("BAPS") temples in India, and particularly individuals associated with the central BAPS organization located in Ahmedabad, India.

56.    Defendant Bharat Bhai also directly recruited workers in India to work in the New Jersey temple.  For example, Defendant Bhai, along with others, recruited Plaintiff Pappu to work in New Jersey when Defendant Bhai was visiting India. Two or three times, Defendant Bhai represented to Plaintiff Pappu that if he

worked at the New Jersey temple he would receive better work and salary than in India.

57.    The BAPS associates, trustees, organizations, and temples in India worked in concert with Defendants to make arrangements for Plaintiffs and the R-1 workers to come to the United States.

58.    The contractors and BAPS associates, working through their prior contacts with workers and neighbors in India, recruited workers who were interested in obtaining stonework and construction jobs in the United States.

59.    After workers were recruited for work in New Jersey, they were required to get medical examinations in India.  These medical examinations took place in Ahmedabad and Pindwara, at medical facilities affiliated with BAPS.  Plaintiffs and the R-1 workers had to travel, at their own expense, to obtain these medical examinations.

60.    Workers were also required to sign agreements in connection with their recruitment for work in the United States.  The agreements were provided to the workers by BAPS-affiliated individuals during meetings in India.  Workers had to travel, at their own expense, to the meeting locations, in some cases multiple times.

61.    The agreements were approximately 10 pages long.  Some workers were given versions of the agreement entirely in English, and others received two versions of the agreement, one in Hindi and one in English.

62.     The majority, if not all, of the R-1 workers do not read or understand English; none of the named Plaintiffs read or understand English.

63. Workers were not given any time to review the agreements – even the Hindi versions of the agreement – but were just told to quickly sign in multiple places.

64. The description of the U.S. work that BAPS-related individuals gave the Plaintiffs and the other R-1 workers in India was a far cry from the work the Plaintiffs and other R-1 workers were ultimately required to perform.

65. Plaintiffs and the other R-1 workers were told they would be working much shorter workdays – ranging from four to seven hours per day – than the twelve to thirteen hours per day they actually were required to work.

66. Plaintiffs and the other R-1 workers were also told that they would work 20-25 days per month, rather than the 30 or 31 days per month that they actually worked.

67. The Plaintiffs and the other R-1 workers were not told specifically what their pay rate for the New Jersey work would be, but were just told that they would be paid what the other R-1 workers already working at the temple in New Jersey were being paid.

68. During the recruitment process, the workers were told that they would be coming to the United States as R-1 visa holders.

69. According to the U.S. Citizenship and Immigration Services website, "[a]n R1 nonimmigrant is an alien who is coming to the United States temporarily to work at least part time … as a minister or in a religious vocation or occupation."

70. According to the same website, to qualify for an R-1 visa, an individual "must have been a member of a religious denomination having a bona fide non-profit

religious organization in the United States for at least two years immediately
before filing the petition."

71.   The Plaintiffs and R-1 workers did not work as ministers or in a religious vocation
or occupation in New Jersey.  Instead, they performed manual labor.

72.   At various times, workers were coached by BAPS-related personnel about what to
say when they went to the U.S. Embassy for visa interviews.

73.   Although the Plaintiffs and R-1 workers would be performing manual labor for
pay at the temple, they were told to describe their work in the United States as
volunteer work at the temple, and to say that they would be performing the work
as a service to the deities.

74.   The Plaintiffs and other R-1 workers did not undertake their work for Defendants
for religious reasons, but worked for Defendants in order to earn wages.

75.   Defendants' agents instructed the Plaintiffs and the R-1 workers to tell Embassy
officials that they would not be paid for the work they would perform.

76.   Defendants' agents instructed the Plaintiffs and the other R-1 workers to tell the
Embassy staff that they would be doing decorative painting or carving working
(nikashi) on stones to be used in the New Jersey temple.

77.   In reality, the workers did not perform such decorative painting or carving work.

78.   The vast majority if not all of the nikashi work for the temple was in fact
performed in India, and the stones were shipped to New Jersey already carved.

79.   The Plaintiffs and the R-1workers were interviewed at the U.S. Embassy in Delhi.
After their visa interviews, the workers returned to their homes to await word
about when they would travel to the United States.

80.    Upon being informed that their work in the United States would begin shortly, the workers traveled, again at their own expense, to Ahmedabad, India to prepare for travel to the U.S.

81.    In Ahmedabad, workers were told that they would need to bring bags of materials for the temple to the United States; these bags would be checked in their names at the airport.  While the workers were not told what was in these bags, at least one Plaintiff observed that a bag appeared to contain prescription drugs such as antibiotics.

82.    As described above, throughout and as part of their preparation for going to work in New Jersey, workers regularly had to travel to the BAPS locations from their hometowns at their own expense.

83.    The costs of travel incurred by the Plaintiffs and other R-1 workers generally ranged from 1500 rupees (approximately $20 USD) to 20,000 rupees (approximately $275) or more for each trip.

*Travel to the United States*

84.    When it was time for their work in New Jersey to begin, the Plaintiffs and the R-1 workers flew to New York City from India.

85.    Throughout the recruitment process in India, Defendants' agents maintained possession of the Plaintiffs' and other R-1 workers' passports.  Defendants' agents held some workers' passports for almost a year.

86.    The Defendants' agents held the workers' passports in the course of and with the intent to defraud the United States government about the nature and purpose of the work that the Plaintiffs and R-1 workers would perform in the United States.

87.   Prior to boarding planes in India, Defendants' agents handed the workers their passports and visas, but the workers were allowed to hold onto their passports and visas only for the duration of the flight to the United States and until they passed through customs in the United States.

88.   After reaching the United States and passing through customs, representatives of the Defendants again confiscated the Plaintiffs' and other R-1 workers' passports and visas – even before they had left the airport.

89.   The Plaintiffs and the R-1 workers were never able to recover their passports or visas during the entire time they were in the United States.

*Work, pay, and labor trafficking in New Jersey*

90.   Approximately one day after arriving in New Jersey, the Plaintiffs and the R-1 workers began their work at the Robbinsville temple in New Jersey.

91.   The work they performed was not decorative stone painting or carving, but was cutting stones, laying stones, removing garbage, road work, dipping stones in chemicals, and other tasks.

92.   At times during their employment by the Employer Defendants, Plaintiffs and the R-1 workers wore uniforms that had "BAPS" imprinted on them.

93.   There were usually 80-120 workers performing manual labor at the temple, although the number of workers would go down during winter months.   The workers, who lived in crowded trailers provided by Defendants within the temple compound, would be summoned to work each day by a siren.

94.   These workers had essentially the same schedule every day while working at the temple.   They began work each day at 6:30 a.m.

95.   At or around 9:00 a.m. each day, they would have a 15-minute break for breakfast.

96.   At around 1:00 p.m., the workers would have a 30-minute break for lunch.

97.   At or around 4:00 p.m., the workers would have a 15-minute break for tea.

98.   The Plaintiffs and the R-1 workers would complete their days of work at or around 7:30 p.m.

99.   Around the time when Daylight Savings Time was in effect, the workers' schedule would shift slightly.   However, the length of their workdays remained the same throughout their entire employment.

100.  The Plaintiffs and the R-1 workers never received any paystubs or statements showing the dates and hours that they worked.

101.  The workers maintained this punishing schedule seven days a week.  They were only rarely given a day off, being allowed only one day off every 30 to 40 days. They worked outside even during rain or snow.

102.  For this work, the Plaintiffs and the R-1 workers were paid approximately 31,000 – 35,000 rupees, currently approximately $425 – $450 USD.  Of this total pay, approximately $50 USD would be paid to the workers in cash in New Jersey.

103.  The rest was paid to the Plaintiffs' and the other R-1 workers' bank accounts in India once a month.  The amounts paid in India to the Plaintiffs and the other R-1 workers were approximately 28,5000 rupees ($391 USD) to 31,000 rupees ($425 USD) per month; the exact amount varied based upon the exchange rate at the time the monthly $50 cash was paid.

104. Upon information and belief, the Defendant BAPS Swaminarayan Sanstha paid these amounts to accounts in India:

    a. so the Plaintiffs and other R-1 workers would not have the financial means to escape from the forced labor at the hands of Defendants;

    b. so the Plaintiffs and other R-1 workers would suffer stigma and other reputational harm in India if they tried to escape from the forced labor at the hands of Defendants; and

    c. so the Plaintiffs' and other R-1 workers' families would suffer financial harm if the Plaintiffs and other R-1 workers tried to escape from the forced labor at the hands of Defendants.

105. The electronic notifications that workers received on their cellular phones when funds were deposited in their India accounts at least at times referred to the monthly deposits by Defendant BAPS Swaminarayan Sanstha as "SALARY."

106. The Plaintiffs and the other R-1 workers were not given the option to receive the rupee portion of their salary in the United States at the time it was earned; their only option was to have monthly payments made to the Indian accounts to which they had no immediate access.

107. It was mandatory that workers provide their Indian bank account information to the staff at the temple in order for them to receive pay.

108. Workers were fined for what Defendants considered infractions of work rules, resulting in their receiving even lower salaries than the 28,500 to 31,000 rupees monthly.

109.   For example, Mukesh Kumar was fined 7,500 rupees ($102 USD, and approximately 26% of his monthly salary) when he was observed without a helmet on.

110.   In no manner were Plaintiffs and the R-1 workers at the Robbinsville temple volunteers.

111.   The work the Plaintiffs and the R-1 workers performed at the temple was done with the promise, expectation, and receipt of compensation – albeit extremely low compensation – for the services rendered.

112.   Their work was not performed for their personal purposes or pleasure, and their services were not donated.

113.   The Plaintiffs and the R-1 workers were completely dependent on the Defendants and their agents for long periods of time while they were in New Jersey. Defendants and their agents exercised significant control over Plaintiffs and the R-1 workers during the time that they traveled to and were in New Jersey.

114.   Even when the Plaintiffs and other R-1 workers were allowed to return to India, Defendants and their agents kept the workers under their control by retaining their passports.  Defendants and their agents also required some workers to make financial guarantees that other workers would return from India to New Jersey to work.  For example, one worker was fined 35,000 rupees (presently $480; more than a month of the workers' meager wages) when a worker he had guaranteed in fact did not return to New Jersey to work.

115.   The Plaintiffs and the R-1 workers were unable to leave the temple in New Jersey, where they lived and where they were under the constant control of temple staff.

116.   The Defendants and their agents concealed, confiscated, and possessed Plaintiffs' and other R-1 workers' passports and visas the entire time they worked at the temple in order to, without lawful authority, maintain and restrict the workers' labor and to force them to work.

117.   Workers were threatened that if they talked to people outside of the temple they would be fined or sent home.

118.   There are as many as 50 cameras throughout the temple's Robbinsville campus. The screens to view those cameras' recordings are in the main office of the temple.   From there, temple staff can watch what was going on throughout the temple premises.

119.   There are even cameras outside the trailers in which the Plaintiffs and the R-1 workers live.   Cameras would record whenever workers went in or out of the trailers.

120.   Some workers were told that if they went outside of the temple complex, the police would arrest them because the workers did not have their passports or visas.   In that case, the workers were told, the temple would not be responsible for the workers.

121.   Defendants intentionally recruited people from the Scheduled Caste, also known as Dalits, and people in other marginalized communities because Defendants knew these workers suffered from rampant discrimination and therefore had very limited economic opportunities, access to services, and government protection in India.   Defendants essentially weaponized India's caste system, using it to coerce

the Plaintiffs and other R-1 workers to work for substandard pay under abysmal conditions in New Jersey.

122. Defendants' agents at the BAPS India temple organization are still holding the passports of workers who returned to India, even now.   Plaintiff Devi Laal, for example, was told that the India temple would need to hold onto his passport until the visa for work at the New Jersey temple expires in 2022.

123. By continuing to hold workers' passports after they returned to India, Defendants' agents prevented Plaintiffs from securing other work opportunities outside of India or from receiving humanitarian or other visas from other nations.

124. Most of the work Plaintiffs and other R-1 workers did at the temple was very dangerous.  They had to manage stones that weighed several tons, they were exposed to and breathed dust from cut stones and chemical solutions used to soak the stones, and they were frequently exhausted by the long hours with almost no days off.

125. One R-1 worker, Moham Lal, died while he was subjected to forced labor at the temple.

*Supervisors and Employers*

126. The Employer Defendants collectively had the power to establish, and did establish – directly or through their agent(s) – the terms of Plaintiffs' and other R-1 workers' employment.

127. The Employer Defendants, directly or indirectly, determined the rate and method of payment to be paid to Plaintiffs and other R-1 workers.  The Employer Defendants collectively had the power to hire and fire Plaintiffs and other  R-1

workers, and each exercised that power, whether directly or indirectly through their agent(s).

128.   The Employer Defendants collectively maintained employment records for the Plaintiffs and other R-1 workers.

129.   The Employer Defendants, directly or indirectly, managed, supervised, and directed the work Plaintiffs and other R-1 workers completed at the temple in Robbinsville.

130.   Plaintiffs and other R-1 workers worked under the daily supervision of Defendants Bharat Bhai, Pankaj Patel, and Swami Prasanand.

131.   Defendants Pankaj Patel, Bharat Bhai, Kanu Patel, and Swami Prasanand also directed the activities of temple supervisors including Ritesh Bhai, Vishal Bhai, Jignesh Bhai, Chirag Bhai, and Adadh Bhai, who in turn supervised the Plaintiffs and other R-1 workers.

132.   The Employer Defendants, directly or indirectly, had and routinely exercised their power to review and approve the work of Plaintiffs and other R-1 workers. When the Employer Defendants decided that work was not done correctly or to their satisfaction, the Employer Defendants would communicate their dissatisfaction to Plaintiffs and other R-1 workers.

133.   For example, Swami Prasanand regularly observed the work of the Plaintiffs and other R-1 workers and would deduct wages from a workers' pay if he observed that worker briefly idling, smoking, or otherwise not acting in accordance with temple rules.

134.  Defendant Swami Prasanand also would meet regularly with the Plaintiffs and other R-1 workers and tell them to do good work, to work fast, and to work with attention.

135.  Defendant Bharat Bhai regularly oversaw the work of the Plaintiffs and other R-1 workers, correcting their performance and directing individual work tasks.

136.  When Plaintiff Pappu complained to Bharat Bhai about the difference between his promised hours and pay and his actual hours and pay, Defendant Bhai told Plaintiff Pappu to "be patient" and that he was "serving God."

137.  Defendant Pankaj Patel also oversaw the work of the Plaintiffs and other  R-1 workers on a daily basis.

138.  Defendants Kumar Patel, Bharat Bhai, Pankaj Patel, and Swami Prasanand, directly or indirectly, directed the Plaintiffs and other  R-1 workers as to the manner in which they should perform their work.

139.  Supervisors, including individual Defendants, trained Plaintiffs and other R-1 workers on the method for completing various tasks.

140.  Through the workers' supervisors, the Employer Defendants also held regular meetings, approximately every 10 days, with the Plaintiffs and other R-1 workers to reinforce rules of the employment.  During these meetings, the supervisors would read from a written list of the rules.

141.  Among the rules were prohibitions on visitors, alcohol, and speaking with individuals from outside of the temple.

142.  Workers were told that if they spoke to outside people or if they left the temple premises they would have deductions taken from their wages.

143. Upon information and belief, Defendants Kumar Patel, Bharat Bhai, Pankaj Patel, and Swami Prasanand were each involved in deducting monies from workers' wages when the Employer Defendants believed that the workers violated rules of the workplace.

*Further allegations*

144. Upon information and belief, the Employer Defendants failed to post the notices required by the FLSA and the New Jersey Wage & Hour and Wage Payment laws.

145. The Employer Defendants, through their wrongful and illegal conduct, prevented Plaintiffs and other R-1 workers from asserting their legal claims while the Employer Defendants employed Plaintiffs.

146. The Employer Defendants' failure to pay Plaintiffs and other R-1 workers as required by the FLSA and the New Jersey Wage & Hour and Wage Payment laws was willful and intentional.

147. The Employer Defendants knew that their failure to pay Plaintiffs and the other R-1 workers was prohibited by the FLSA and New Jersey Wage & Hour and Wage Payment laws, or they showed willful disregard as to whether their actions were so prohibited.

148. During the course of their employment, the Plaintiffs and other R-1 workers handled, sold, or otherwise worked on items that were produced for movement in interstate commerce.

149. Defendants knowingly benefited financially and by receiving anything of value (including, but not limited to, Plaintiffs' and other R-1 workers' labor, the

construction and resulting added value of the temple, donations and other contributions, and financial profits) from participating in a venture Defendants knew or should have known engaged in violations of Title 18, Chapter 77 of the United States Code.

150.   Defendants undertook all the actions and omissions alleged above either directly or through their agents who were authorized to undertake such actions and omissions.

<u>FLSA Collective Allegations</u>

151.   Plaintiffs bring their FLSA claims on behalf of themselves and those individuals who may opt into this action pursuant to 29 U.S.C. § 216(b) and who were not paid required wages at the temple between May 11, 2018 and the date of preliminary approval of the opt-in class.

152.   Alternatively, if the Court equitably tolls the FLSA statute of limitations, Plaintiffs bring their FLSA claims on behalf of themselves and those individuals who may opt into this action pursuant to 29 U.S.C. § 216(b) and who were not paid required wages at the temple between May 11 , 2011 and the date of preliminary approval of the opt-in class.

153.   Plaintiffs and other R-1 workers were subject to the same policies and practices of the Employer Defendants.

154.   All of the Plaintiffs and other R-1 workers worked at BAPS's Robbinsville, New Jersey location.

155.     Common proof applicable to Plaintiffs and the R-1 visa workers in this single

location will show that the Employer Defendants failed to properly pay wages to

Plaintiffs and other R-1 workers.

156.     Plaintiffs are currently unaware of the identities of all the employees who would

be members of the FLSA opt-in class, but this information is readily ascertainable

from the Employer Defendants' records.  The Employer Defendants therefore

should  be required to provide Plaintiffs with a list – including last known

addresses, telephone numbers, and email addresses if known – of all individuals

who were R-1 workers for the Employer Defendants between May11, 2011 and

the present.

<u>Rule 23 Class Allegations</u>

157.     The Plaintiffs bring their TVPA claim – the First Cause of Action– on behalf of

themselves and a class of persons (the "TVPA Class") consisting of:

> All individuals who worked in non-supervisory roles at the
> Robbinsville, NJ temple as construction and/or stone workers
> under R-1 visas between May 11, 2011 and the present.

158.     The Plaintiffs bring their state law claims – the Third, Fourth, Fifth, and Sixth

Causes of Action– on behalf of themselves and a class of persons (the "State Law

Class") consisting of:

> All individuals who worked in non-supervisory roles at the
> Robbinsville, NJ temple as construction and/or stone
> workers under R-1 visas between May 11, 2015 and the
> present.

159.     Alternatively, if the Court equitably tolls the statutes of limitations on the

Plaintiffs' New Jersey Wage & Hour and Wage Payment law claims, the

Plaintiffs  bring these claims – the Third and Fourth Causes of Action– on behalf

of themselves and a class of persons (the "State Wage & Hour Law Class")

consisting of:

> All individuals who worked in non-supervisory roles at the
> Robbinsville, NJ temple as construction and/or stone workers
> under R-1 visas between May 11, 2011 and the present.

160. Excluded from the classes described in paragraphs 157 – 159 above (collectively,

the "Classes") are the legal representatives, officers, directors, assigns, and

successors of Defendants; any individual who at any time during the class period

has had a controlling interest in any Defendant; and all persons who submit timely

and otherwise proper requests for exclusion from the Classes.

### *Numerosity*

161. Upon information and belief, there are at least 200 individuals who work or have

worked at the Robbinsville temple who would be members of the Classes in this

action.

162. The members of the Classes are sufficiently numerous that joinder of all members

is impractical.

163. Plaintiffs are currently unaware of the identities of all of the employees who

would be members of the Classes, but this information is readily ascertainable

from Defendants' records.   Defendants should therefore be required to provide

Plaintiffs with a list – including last known addresses, telephone numbers, and

email addresses if known – of all individuals who worked as construction and/or

stone workers under R-1 visas between May 11, 2011 and the present.

### *Existence and Predominance of Common Questions*

164.    Common questions of law and fact exist as to Plaintiffs and all members of the

Classes and predominate over questions affecting only individual Class members.

165.    These common questions include:

a)      Whether the Employer Defendants paid Plaintiffs and the R-1 workers the

minimum wage and overtime for all hours worked as required by the New

Jersey Wage & Hour and Wage Payment laws; whether the Employer

Defendants paid Plaintiffs and the R-1 workers at least once each calendar

month; and whether the Employer Defendants improperly withheld or

diverted a portion of Plaintiffs and the R-1 workers' wages;

b)      Whether the Employer Defendants had a policy of failing to pay Plaintiffs

and the R-1 workers as required by law; and

c)      Whether the Employer Defendants' policy of failing to pay Plaintiffs and

the R-1 workers was willful or with reckless regard of the law;

d)       Whether Defendants knowingly recruited and obtained Plaintiffs' and the

R-1 workers' labor or services by means of (i) physical restraint; (ii)

threats of physical restraint; (iii) serious harm; (iv) threats of serious harm;

(v) abuse of legal process; (vi) threatened abuse of legal process; and/or

(vii) a scheme, plan, or pattern intended to cause Plaintiffs and the R-1

workers to believe that, if they did not perform such labor or services, they

or another person would suffer serious harm or physical restraint;

e)      Whether Defendants knowingly recruited, transported, harbored, provided,

and/or obtained the Plaintiffs and the R-1 workers so as to obtain their

labor and services by the means described in paragraph 165 (d), *supra*;

f)      Whether Defendants conspired to commit the acts described in paragraphs 165 (d) and (e), *supra*;

g)      Whether Defendants concealed, removed, confiscated, and/or possessed Plaintiffs' and other class members' passports in the course of committing and/or with the intent (i) to commit the acts described in paragraphs 165 (d) and (e), *supra*, and/or (ii) to knowingly and intentionally defraud the United States government to recruit, solicit and hire Plaintiffs and other R-1 workers outside the United States;

h)      Whether Defendants were perpetrators of the acts described in paragraphs (d) through (g), *supra*;

i)      Whether Defendants knowingly benefitted, financially or by receiving anything of value from participating in a venture Defendants knew or should have known engaged in the acts described in paragraphs (d) through (g), *supra;*

j)      Whether Defendants received a benefit from the Plaintiffs and the R-1 workers by having the workers perform stonework and/or construction work at Defendants' properties, and whether Defendants' retention of that benefit without substantial payment to the Plaintiffs and the other R-1 workers would be unjust;

k)      Whether (1) the Plaintiffs and the other R-1 workers performed stonework and/or construction work services in good faith for Defendants; (2) whether these services were accepted by the Defendants; (3) whether Plaintiffs and the other R-1 workers reasonably expected full

compensation for the stonework and/or construction work services that they performed; and (4) whether the benefit of these services was conferred upon Defendants under circumstances that should have put the Defendants on notice that the Plaintiffs and the R-1 workers expected to be paid for the full value of the services; and

l)      The nature and extent of class-wide injury and the measure of damages for those injuries.

<em>Typicality</em>

166.    Members of the proposed Classes have all been subject to the same unlawful practices of Defendants, and their claims arise out of these same practices.

167.    Plaintiffs and the proposed class members have the same statutory rights under the New Jersey Wage & Hour and New Jersey Wage Payment laws, and are all non-exempt employees within the meaning of the New Jersey Wage & Hour and Wage Payment laws.

168.    Plaintiffs and the proposed class members performed the same type of work under the same circumstances giving rise to the same claims for unjust enrichment and quantum meruit.

169.    Defendants subjected Plaintiffs and the proposed class members to the same coercive rules and practices that constituted violations of the TVPA.

170.    Plaintiffs and proposed class members suffered similar types of damages.

171.    Plaintiffs' claims are typical of the claims of the Class because, among other things, Plaintiffs were employees who worked for Defendants and suffered the same violations as the proposed class members.

172.   Plaintiffs' interests are co-extensive with the interests of the Class members; Plaintiffs have no interest adverse to the Class members.

<em>Adequacy</em>

173.   Plaintiffs will fairly and adequately represent the interests of the class members. Their interests do not conflict with the interests of the members of the Class they seek to represent.

174.   Plaintiffs understand that, as class representatives, they assume responsibilities to the Classes to represent their interests fairly and adequately.

175.   Plaintiffs have retained counsel experienced in prosecuting class actions and in employment matters.  There is no reason why Plaintiffs and their counsel will not vigorously pursue this matter.

<em>Superiority</em>

176.   A class action is superior to other available means for the fair and efficient adjudication of the claims at issue herein.

177.   The damages suffered by each individual Class member may not be sufficient to justify the burden and expense, particularly in light of the transnational nature of this case, of individual prosecution of the litigation necessitated by Defendants' conduct.

178.   Further, it would be difficult for members of the Class to obtain individual redress effectively for the wrongs done to them.   If individual actions were to be brought by each member of the Class, the result would be a multiplicity of actions, creating hardships for members of the Class, the Court, and the Defendants.

179.   The members of the Class are indigent foreign nationals and workers who lack the means and resources to secure individual legal assistance, have virtually no command of the English language or familiarity with the United States legal system, and are particularly unlikely to be aware of their rights to prosecute these claims.

180.   Individualized litigation also presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the Court system.

181.   By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

182.   This case does not present individualized factual or legal issues which would render a class action difficult.

183.   In the alternative, the Class may be certified because: (a)  the prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class members, which would establish incompatible standards of conduct for Defendants; (b) the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and (c) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the members of the Class as a whole.

Causes of Action

First Cause of Action
The Trafficking Victims Protection Act ("TVPA")
(Against All Defendants)
(Class claim)

184.    The Plaintiffs and other R-1 workers reallege and incorporate by reference the foregoing allegations as if set forth fully here.

185.    This Cause of Action sets forth claims by Plaintiffs and the R-1 workers against all Defendants under the civil remedies provision of the TVPA, 18 U.S.C. § 1595, in that

a. Plaintiffs and other R-1 workers are victims of violations of the following provisions of Title 18, Chapter 77 of the United States Code: 18 U.S.C. §§ 1589, 1590, 1592(a), and 1597(a);

b. Defendants were perpetrators of the foregoing violations; and

c. Defendants knowingly benefited, financially or by receiving anything of value from participation in a venture Defendants knew or should have known engaged in the foregoing violations.

186.    Defendants knowingly recruited and obtained Plaintiffs' and the R-1 workers' labor or services.

187.    Defendants attempted to and did subject Plaintiffs and the R-1 workers to forced labor in violation of 18 U.S.C. § 1589.

188.    In violation of 18 U.S.C. § 1589(1)-(4), Defendants knowingly recruited and obtained the labor or services of Plaintiffs and the R-1 workers by means of:

a. Physical restraint;

b. Threats of physical restraint;

    c.   Serious harm;

    d.   Threats of serious harm;

    e.   Abuse of legal process;

    f.   Threatened abuse of legal process;

    g.   A scheme, plan, or pattern intended to cause Plaintiffs and the R-1 workers to believe that, if they did not perform such labor or services, they or another person would suffer serious harm or physical restraint.

189. Defendants' scheme to, *inter alia*, (a) isolate Plaintiffs and the R-1 workers, (b) coerce them to live and work in conditions causing psychological deterioration and harm, (c) limit their outside contacts, (d) cause financial harm by reducing their wage payments to their families in India if they stepped unaccompanied out of the Defendants' compound or did not abide by Defendants' draconian rules, and (e) cause reputational harm by threatening financial harm to their families was designed to convince Plaintiffs and the R-1 workers that they would suffer serious harm if they were to leave their work and the temple.  Defendants' recruitment of Plaintiffs and other R-1 workers from the Scheduled Caste, also known as Dalit, and other marginalized communities in India exacerbated the serious harm they reasonably believed they would suffer if they left their employment at the temple.

190. In violation of 18 U.S.C. § 1590, and in addition to the violations of 18 U.S.C. § 1589 set forth above, Defendants knowingly recruited, transported, harbored and/or obtained the Plaintiffs and the R-1 workers for labor or services in

furtherance of the Defendants' violations of the following provisions of Title 18, Chapter 77 of the U.S. Code:

a. removing, confiscating, or possessing Plaintiffs' and other R-1 workers' passports and other immigration documents in the course of, or with the intent to violate 18 U.S.C. §1589, violating 18 U.S.C. § 1592(a); and

b. attempting to violate 18 U.S.C. § 1589, thereby violating 18 U.S.C. § 1594(a); and

c. conspiring to violate 18 U.S.C. §§ 1589 and 1592, thereby violating 18 U.S.C. § 1594(b).

191. In violation of 18 U.S.C. § 1592(a), Defendants concealed, removed, confiscated, and/or possessed Plaintiffs' and other R-1 workers' passports and other immigration documents in the course of violating and/or with the intent to violate 18 U.S.C. §§ 1589 and 1590.

192. In violation of 18 U.S.C. § 1594(b), Defendants conspired with each other to violate 18 U.S.C. §§ 1589 and 1592.

193. In violation of 18 U.S.C. § 1597(a), Defendants concealed, removed, confiscated, and possessed Plaintiffs' and other R-1 workers' passports and immigration documents in the course of committing fraud in foreign labor contracting. *See* 18 U.S.C. § 1351(a). Specifically, Defendants concealed, removed, confiscated, and possessed Plaintiffs' and the R-1 workers' passports and immigration documents in the course of knowingly and intentionally defrauding the United States government by falsely claiming Plaintiffs and the R-1 workers would be volunteers.

194.    As a proximate result of the conduct of Defendants, Plaintiffs and the R-1 workers have suffered financial and other damages.

195.    Under the TVPA, Plaintiffs and the R-1 workers are entitled to recover compensatory and punitive damages in an amount to be proven at trial, including but not limited to:

    a.    compensation at the prevailing wage rate including all applicable overtime wages for the work done while employed at Defendants; and

    b.    other compensatory damages; and

    c.    compensation for all moneys paid during the recruitment process and in order to come to the United States to work for Defendants, including travel expenses in India; and

    d.    punitive damages; and

    e.    attorneys' and experts' fees and costs as authorized by 18 U.S.C. § 1595.

Second Cause of Action
Fair Labor Standards Act (Minimum Wage & Overtime)
(Against the Employer Defendants)
(Collective Claim)

196.    The Plaintiffs reallege and incorporate by reference the foregoing allegations as if set forth fully here.

197.    The Employer Defendants willfully and intentionally failed to pay the federal minimum wage to Plaintiffs and to the other R-1 workers who opt into this action for every hour that they worked between May 11, 2011 and the present.

198.    The Employer Defendants' failure to pay the minimum wage violates the Fair Labor Standards Act, 29 U.S.C. § 206(a) and its implementing regulations.

199.   The Employer Defendants also willfully and intentionally failed to pay Plaintiffs and the other R-1 workers who opt into this action overtime at a rate of at least one-and-a-half times the legally-required wage for every hour they worked above forty (40) hours in a work week between May 11, 2011 and the present.

200.   This failure violates the FLSA, 29 U.S.C. § 207(a), and its implementing regulations.

201.   The Employer Defendants also violated the FLSA by failing to keep records as required by statute, 29 U.S.C. § 211(c).

202.   The Plaintiffs and the other R-1 workers who chose to opt into this action are therefore entitled to their unpaid wages, plus an additional equal amount in liquidated damages, as a consequence of the Employer Defendants' unlawful actions and omissions, in accordance with 29 U.S.C. § 216(b).

203.   The Plaintiffs and the other R-1 workers who opt into this action also seek, and are entitled to, the costs of Court and the attorneys' fees incurred by their counsel, pursuant to 29 U.S.C. § 216(b).

<u>Third Cause of Action</u>
<u>New Jersey Wage & Hour Law Violations, N.J.S.A. 34:11-56a et seq.</u>
(as amended on August 6, 2019, S1790)
<u>(Minimum Wage and Overtime)</u>
<u>(Against the Employer Defendants)</u>
<u>(Class Claim)</u>

204.   The Plaintiffs reallege and incorporate by reference the foregoing allegations as if set forth fully here.

205.   The Employer Defendants violated Plaintiffs' and the other R-1 workers' rights by (i) failing to pay them overtime compensation at rates not less than one and one-half of the legally-required rate of pay for each hour worked in excess of

forty hours in a work week, and (ii) failing to pay them at least the legally-mandated state minimum wage for every hour worked between May 11, 2011 and the present.

206.    As a result of the Employer Defendants' violations of the NJWHL, Plaintiffs and the other R-1 workers have suffered damages in amounts to be determined at trial, and are entitled to recovery of such amounts, liquidated damages, prejudgment and post judgment interest, and reasonable attorneys' fees and costs pursuant to the NJWHL.

Fourth Cause of Action
New Jersey Wage Payment Law Violations, N.J.S.A. 34:11-4.4 et seq.
(as amended on August 6, 2019, S1790)
(Illegal Deductions)
(Against the Employer Defendants)
(Class Claim)

207.    The Plaintiffs reallege and incorporate by reference the foregoing allegations as if set forth fully here.

208.    Under New Jersey Wage Payment Law, no employer may withhold or divert any portion of an employee's wages. N.J.S.A. 34:11-4.4 et seq.

209.    The Employer Defendants illegally misappropriated, withheld, and diverted portions the wages of Plaintiffs and other R-1 workers.

210.    As a result of the Employer Defendants' violations of the NJWPL, Plaintiffs and other R-1 workers have suffered damages in amounts to be determined at trial, and are entitled to recovery of such amounts, liquidated damages, prejudgment and post judgment interest, and reasonable attorneys' fees and costs pursuant to the NJWHL.

<u>Fifth Cause of Action</u>
<u>(Unjust Enrichment)</u>
<u>(Against All Defendants)</u>
<u>(Class Claim)</u>

211.   The Plaintiffs reallege and incorporate by reference the foregoing allegations as if set forth fully here.

212.   As described in the paragraphs above, Defendants received a benefit from the Plaintiffs and the other R-1 workers by having them perform stonework and/or construction work at Defendants' properties.

213.   Defendants' retention of that benefit without substantial payment to the Plaintiffs and the other R-1 workers would be unjust.

214.   Plaintiffs and R-1 workers expected to be paid at the time they were recruited to perform the work in New Jersey.

215.   A reasonable person in the Plaintiffs' and the R-1 workers' position would have expected to receive remuneration for the benefit they provided.

216.   Plaintiffs and the R-1 workers are therefore entitled to damages pursuant to New Jersey common law in an amount to be determined at trial.

<u>Sixth Cause of Action</u>
<u>(Quantum Meruit)</u>
<u>(Against All Defendants)</u>
<u>(Class Claim)</u>

217.   The Plaintiffs reallege and incorporate by reference the foregoing allegations as if set forth fully here.

218.   The Plaintiffs and the other R-1 workers performed stonework and construction work services in good faith for Defendants.

219.    The stonework and construction work services performed by the workers were accepted by the Defendants.

220.    Plaintiffs and the other R-1 workers reasonably expected full compensation for the stonework and construction work services that they performed.

221.    The benefit of these services was conferred upon Defendants under circumstances that should have put the Defendants on notice that the Plaintiffs and the R-1 workers expected to be paid for the full value of the services.

222.    Plaintiffs were damaged in the amount of the reasonable value of the services they provided.

223.    Plaintiffs are therefore entitled to damages pursuant to New Jersey common law in an amount to be determined at trial.

<u>Demand for Jury Trial</u>

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury as to all issues so triable.

WHEREFORE, Plaintiffs request that this Court enter an Order:

a.   assuming jurisdiction over this action;

b.   declaring this action to be maintainable as a FLSA collective action pursuant to 29 U.S.C. § 216, allowing Plaintiffs to provide notice of this action to potential opt-in plaintiffs, and allowing those eligible R-1 workers who choose to do so to opt-in to this action;

c.   certifying this case as a class action under Fed. R. Civ. P. 23, naming Plaintiffs as Class Representatives, and appointing Plaintiffs' attorneys as Class Counsel;

d.  declaring that the Employer Defendants violated the FLSA and the New Jersey Wage & Hour and Wage Payment laws, and that all Defendants violated the TVPA;

e.  permanently enjoining Defendants from further violations of the FLSA, New Jersey Wage & Hour and Wage Payments laws, and the TVPA;

f.  granting judgment to Plaintiffs and the other R-1 workers on their TVPA claim and awarding them compensatory and punitive damages;

g.  granting judgment to Plaintiffs and other R-1 workers who opt into this action pursuant to 29 U.S.C. § 216(b) on their FLSA claims and awarding each of them their unpaid wages plus an equal amount in liquidated damages;

h.  granting judgment to Plaintiffs and the other R-1 workers on their New Jersey Wage & Hour law and Wage Payment law claims and awarding them their unpaid wages, applicable statutory damages, and liquidated damages as provided for by statute;

i.  granting judgment to Plaintiffs and the other R-1 workers on their quantum meruit and unjust enrichment claims and awarding them damages as allowed by law;

j.  awarding Plaintiffs and the R-1 workers prejudgment and postjudgment interest as allowed by law;

k.  awarding Plaintiffs and the R-1 workers their costs and reasonable attorneys' fees; and

l.  granting such further relief as the Court finds just.

DATED:      Princeton, NJ
            May 11, 2021

JAFFE GLENN LAW GROUP


<u>/s Andrew I. Glenn</u>
Andrew Glenn
300 Carnegie Center, Ste. 150
Princeton, NJ 08540
(201) 687-9977
aglenn@jaffeglenn.com
*Attorneys for Plaintiffs*

Patricia Kakalec
Kakalec Law PLLC
195 Montague Street, 14th Floor
Brooklyn, NY 11201
(212) 705-8730
Patricia@KakalecLaw.com
*(Pro hac vice motion to be filed)*

Daniel Werner
Radford & Keebaugh, LLC
315 W. Ponce de Leon Ave., Suite 1080
Decatur, GA 30030
(678) 271-0304
dan@decaturlegal.com
*(Pro hac vice motion to be filed)*