**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MUKESH KUMAR, *et al.*,<br>*Plaintiffs,*<br><br>*v.*<br><br>BOCHASANWASI SHRI AKSHAR PURUSHOTTAM SWAMINARAYAN SANSTHA, INC., *et al.*,<br>*Defendants.* | Civ. Action No.:<br>21-CV-11048 (GC)(TJB)<br><br>**ORAL ARGUMENT REQUESTED** |

# PLAINTIFFS' MEMORANDUM OF LAW OPPOSING DEFENDANTS' MOTION TO DISMISS

Hugh Baran
Katherine Wutchiett
KATZ BANKS KUMIN LLP

Patricia Kakalec
KAKALEC LAW PLLC

Daniel Werner
RADFORD SCOTT LLP

Andrew Glenn
JAFFE GLENN LAW GROUP

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iv

FACTUAL BACKGROUND ........ 2

RELEVANT PROCEDURAL BACKGROUND ........ 5

LEGAL STANDARD ........ 6

ARGUMENT ........ 6

I. Defendants' Premature Arguments Must be Rejected. ........ 6

A. The Court Cannot Rely on Defendants' Religious Documents. ........ 6

B. It Would be Premature for the Court to Consider the Ministerial Exception, Which in Any Event Does Not Apply Here. ........ 8

1. The Ministerial Exception, a Defense Not Apparent From the Operative Complaint, Does Not Support Dismissal. ........ 8

2. Plaintiffs and the Other R-1 Workers Were Not Ministers. ........ 11

3. Not All Defendants are Religious Entities. ........ 12

4. The Ministerial Exception Does Not Apply to Plaintiffs' Specific Claims. ........ 13

C. Defendants' Bid to Dismiss Class Allegations is Premature and Plaintiffs Plausibly Plead All Class Claims. ........ 16

1. Plaintiffs Sufficiently Plead a Rule 23 Class and Defendants' Motion is Premature. ........ 16

2. Plaintiffs Do Not Plead a Fail-Safe Class. ........ 17

3. Plaintiffs Plausibly Plead the Rule 23 Requirements of Commonality, Superiority, & Numerosity. ........ 18

II. Plaintiffs State Plausible Claims. ........ 21

A. Plaintiffs Plausibly Plead FLSA and State Wage and Hour Claims. ........ 21

1. Plaintiffs' FLSA and State Wage Claims Are Not Time Barred. ........ 21

2. The Workers Here Were Covered By the FLSA, and Their FLSA Claims Should Not Be Dismissed. ........ 24

a. The Court Should Look to Economic Realities and the Totality of the Circumstances. ........ 24

b. Plaintiffs Have Sufficiently Alleged that Defendants Were Engaged in Commercial Activities and the Workers Were Individually Engaged in Commerce. ....26

c. Plaintiffs Have Plausibly Alleged That They And Other Workers Were Employees Under the FLSA. ....28

3. The Court Should Not Dismiss the State Wage & Hour Claims. ....30

B. Plaintiffs Plausibly Plead TVPA Violations. ....32

1. Plaintiffs State a Claim for Forced Labor. ....33

a. Defendants' Claim That Plaintiffs "Volunteered" is a Disputed Fact Not Appropriate For Resolution Here. ....35

b. Plaintiffs Do Not and Need Not Allege Defendants Used Actual Force or Threats of Force to Obtain Forced Labor. ....39

c. Fines for Alleged Workplace Infractions Were Means of Coercion and Not "Legitimate Consequences," and Were Part of the Comprehensive Scheme of Forced Labor Here. ....40

d. Plaintiffs Sufficiently Plead Abuse or Threatened Abuse of Law or Legal Process. ....41

e. The SAC Plausibly Pleads the Required *Mens Rea*. ....42

2. Plaintiffs Plausibly Plead Document Servitude Under 18 U.S.C. §§ 1592 and 1597. ....43

3. The SAC Plausibly Pleads Trafficking for Forced Labor. ....44

C. Plaintiffs Plausibly Plead Section 1981 Claims. ....46

D. Plaintiffs' RICO Claims Are Adequately Pleaded. ....49

E. Plaintiff Plausibly Plead Claims for Quasi-Contract Remedies ....54

III. The Court Should Reject Defendants' "Hail Mary" Bid to Compel Arbitration After Repeatedly Making Use of the Civil Court System. ....55

A. By Invoking the TVPA's Civil Lawsuit Stay Provision and Moving for Adjudications on the Merits, Defendants Have Waived Arbitration. ....55

B. Defendants Fail to Prove the Existence of a Valid Agreement to Arbitrate With a Clear and Unambiguous Waiver of Rights. ....57

IV. Leave to Amend Any Pleading Deficiencies Should Be Freely Granted. .60

CONCLUSION ....60

# TABLE OF AUTHORITIES

**Cases**

*Acosta v. Cathedral Buffet, Inc.,* 887 F.3d 761 (6th Cir. 2018) ........................ 25, 26
*Acosta v. Paragon Constrs. Corp*., 884 F.3d 1225 (10th Cir. 2018)........................26
*Alcazar v. Corp. of the Cath. Archbishop of Seattle*, 627 F.3d 1288
(9th Cir. 2010) ...........................................................................9, 11, 12
*Alpizar-Fallas v. Favero*, 908 F.3d 9103d Cir. 2018) ...........................................53
*Antonatos v. Waraich*, 2013 WL 4523792 (D.S.C. Aug. 27, 2013) .........................35
*Aragon v. Che Ku*, 277 F. Supp. 3d 1055 (D. Minn. 2017) ....................................39
*Arellano v. Marshalls of MA, Inc.*, 2018 WL 1120870 (N.D. Ind. Feb. 2, 2018)....38
*Atalese v. U.S. Legal Servs.*, 219 N.J. 430 (2014) ........................................... 58, 59
*Aurandt v. Brown*, 2017 WL 1215451 (W.D. Pa. March 31, 2017).........................52
*Barghout v. Bayer Healthcare Pharm.*, 2012 WL 1113973
(D.N.J. March 30, 2012) ..........................................................................21
*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ..............................................6
*Bennet v. Nucor Corp.*, 656 F.3d 802 (8th Cir. 2011) ............................................20
*Benshoff v. City of Va. Beach,* 180 F.3d 136 (4th Cir. 1999) ..................................26
*Bigelow v. Sassafras Grove Baptist Church,* 247 N.C.App. App. 2016)................14
*Bolden v. Walsh Const. Co.*, 688 F.3d 893 (7th Cir. 2012) ....................................20
*Bonham v. Dresser Indus., Inc.*, 569 F.2d 187 (3rd Cir. 1977) ...............................23
*Boyle v. United States*, 556 U.S. 938 (2009)............................................. 49, 50, 52
*Bradshaw v. CHW Grp., Inc.*, 763 F. Supp. 3d 641 (D.N.J. 2025) .................. 17, 21
*Branch v. Cream-O-Land Dairy*, 244 N.J. 567 (2021) ...........................................30
*Burrell v. Staff*, 60 F.4th 25 (3d Cir. 2023)..................................................... *passim*
*Byrd v. Aaron's Inc.*, 784 F.3d 154 (3d Cir. 2015)........................................... 17, 18
*Byron v. Avant Healthcare Professionals, LLC*, 2024 WL 2304490
(M.D. Fla. Apr. 10, 2024).........................................................................33
*Cada v. Baxter Healthcare Corp*., 920 F.2d 446 (7th Cir. 1990) .............................22
*Cannon v. Ashburn Corp.*, 2016 WL 7130913 (D.N.J. Dec. 7, 2016).....................53
*Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001) ............................53
*Charlot v. Ecolab, Inc.*, 2019 WL 6888621 (D.N.J. Dec. 17, 2019) .......................20
*Chavez-DeRemer v. Mennonite Messianic Mission of the E. Pa. Mennonite Church,* 2025 WL 3653555 (M.D. Pa. Dec. 17, 2025)................................ 25, 28

*Choate v. Breaux*, 2012 WL 4103934 (M.D. Pa. Aug. 31, 2012) ............................60
*Clancy v. Salvation Army,* 2023 WL 1344079 (N.D. Ill. Jan. 31, 2023)..................29
*Claros v. Marvin's Refrigeration Corp.*, 800 F. Supp. 3d 391 (N.D.N.Y. 2025) .....40
*Dale Carmen v. Health Carousel, LLC*, 2021 WL 2476882
(S.D. Ohio June 17, 2021) ..........................................................................36
*Demkovich v. St. Andrew the Apostle Par.*, 3 F.4th 968 (7th Cir. 2021) ..................10
*Dole v. Shenandoah Baptist Church,* 899 F.2d 1389 (4th Cir. 1990), *cert. denied*,
498 U.S. 1389 (1990)..................................................................................10
*Ellison v. Inova Health Care Servs.*, 692 F. Supp. 3d 548 (E.D. Va 2024)..............20
*Emp't Div. v. Smith,* 494 U.S. 872 (1990) ...............................................................10
*Gamboa v. KISS Nutraceuticals*, 777 F.Supp.3d 1210 (D. Colo. 2025)..................18
*Garanin v. Lackawanna Cnty.*, 2022 WL 21770058 (M.D. Pa. Feb. 4, 2022) ........38
*Genarie, v. PRD Mgmt.,* 2006 WL 436733 (D.N.J. Feb. 17, 2006).................. 25, 26
*General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147 (1982) ....................16
*Gray v. BMW of N. Am., LLC*
*Guimaraes v. Metal Transp., LLC,* 790 F. Supp. 3d 389 (M.D.Pa. Jul. 10, 2025) ..22
*Hargrove v. Sleepy's, LLC*, 220 N.J. 289 (2015)......................................................30
*Harris v. Pathways Cmty. Behavioral Healthcare*, 2011 WL 13290777
(W.D. Mo. July 14, 2011)............................................................................27
*Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349 (3d Cir. 2013) .................................21
*Hearn v. Kennell*, 2009 WL 3460455 (C.D. Ill. Oct. 22, 2009).................................7
*Hedges v. U.S.*, 404 F.3d 744 (3d Cir. 2005)..............................................................6
*Hernandez v. Comm'r,* 490 U.S. 680 (1989)..........................................................10
*Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912 (3d Cir. 1992).......................55
*In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2008)..................21
*In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 (3d Cir. 2010) ............. 50, 51, 52
*In re Pharmacy Ben. Mgrs. Antitrust Litig.*, 700 F.3d 109 (3d Cir. 2012)...............57
*Johnson v. NCAA,* 108 F.4th 163 (3d Cir. 2024)............................................... 24, 25
*Johnson-Medland v. Bethanna,* 1996 WL 612467 (E.D.Pa. Oct. 17, 1996)............27
*Keeley v. Loomis Fargo & Co.*, 183 F.3d 257 (3d Cir. 1999) .................................15
*Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406 (3d Cir. 1991) ........................6
*Kernahan v. Home Warranty Admin.*, 236 N.J. 301 (2019).....................................58
*Kirkleis v. Dickie*, 560 F.3d 156 (3d Cir. 2009) ............................................... 57, 59

*Klick v. Cenikor Found.,* 94 F.4th 362 (5th Cir. 2024) ..........................................26
*Krause v. Cherry Hill Fire Dist. 13*, 969 F. Supp. (D.N.J. 1997) ............. 25, 28, 29
*Kwai Fun Wong v. Beebe,* 732 F.3d 1030 (9th Cir. 2013),
*aff'd, U.S. v. Kwai Fun Wong,* 575 U.S. 402 (2015) ..........................................22
*Lopez v. Janus Int'l Grp., Inc.*, 2024 WL 4294638 (E.D. Va. Sept. 24, 2024).........41
*Lorenzo v. San Francisco Zen Center,* 116 Cal.App.5th 258
(1st Dist. Ct. App 2025) ............................................................................................14
*Magtoles v. United Staffing Registry, Inc.*, 2021 WL 6197063 (E.D.N.Y. Dec. 30, 2021 ................................................................................................... 35, 36, 37
*Marquez v. Upstairs at Chef Vola, Inc*., 2022 WL 227447123, 2022).....................31
*Martinez-Rodriguez v. Giles*, 31 F.4th 1139 (9th Cir. 2022)............................ 33, 35
*Mendez Perez v. CJR Framing, Inc.,* 2021 WL 9184298 Jan. 22, 2021).................43
*Menocal v. GEO Grp., Inc.,* 882 F.3d 905 (10th Cir. 2018) ..................................19
*Merrill Lynch v. Cantone Rsch., Inc.*, 427 N.J. Super. 45 (App. Div. 2012) ...........57
*Mielo v. Steak 'n Shake Operations, Inc.* 897 F.3d 467 (3d Cir. 2018) ...... 19, 20, 21
*Min Fu v. Hunan of Morris Food, Inc.,* 2019 WL 1275059 6, 2013)......................22
*Moore v. Primecare Med. Inc.*, 2020 WL 1248976 March 16, 2020)......................20
*Moore v. Rubin*, 160 F.4th 271 (2d Cir. 2025) ........................................................37
*Morgan v. Sundance, Inc.*, 596 U. S. 411 (2022)....................................... 55, 57, 59
*Muchira v. Al-Rawaf*, 850 F.3d 605 (4th Cir. 2017) ..............................................44
*Muhammad v. Dep't of Corr.*, 645 F. Supp. 2d 299 (D.N.J. 2008), *aff'd sub nom.*,
396 F. App'x 789 (3d Cir. 2010).............................................................................42
*Nowak v. Thoroughbred Servs.*, 2021 WL 5937726 (E.D. Pa. Dec. 16, 2021)........57
*Nunag–Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 790 F. Supp. 2d 1134
(C.D. Cal. 2011) ................................................................................................ 35, 45
*Ojeda v. Louis Berger Group (Domestic), Inc.,* 2020 U.S. Dist. LEXIS 178214
(D.N.J. Sep. 28, 2020)..............................................................................................22
*Our Lady of Guadalupe Sch. v. Morrissey-Berru,* 591 U.S. 732 (2020) .............8, 11
*Owino v. CoreCivic, Inc.*, 60 F.4th 437 (9th Cir. 2022) ..........................................19
*Pacheco v. Golden Living Ctr.-Summit*, 2011 WL 744656 Feb. 23, 2011).............51
*Padilla v. AFSCME,* 551 F. Appx. 941 (10th Cir. 2014)..........................................25
*Paguirigan v. Prompt Nursing Emp. Agency LLC*, 2018 WL 4347799
(E.D.N.Y. Sept. 12, 2018) .........................................................................................19

*Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192 (3d Cir. 1993) ........................................................................................7
*Perez v. Express Scripts, Inc.*, 2020 WL 7654305 (D.N.J. Dec. 23, 2020).............30
*Petruska v. Gannon Univ.*, 462 F.3d 294 (3d Cir. 2006)........................................11
*Prince v. Mass.*, 321 U.S. 158 (1944) .....................................................................10
*Red Hawk Fire & Sec., LLC v. Siemens Indus. Inc.*, 449 F.Supp.3d 449 (D.N.J. 2020).........................................................................................6
*Rhea Lana, Inc. v. U.S. Dep't of Labor,* 925 F.3d 521 (D.C. Cir. 2019)..................25
*Ricchio v. McLean*, 853 F.3d 553 (1st Cir. 2017) ............................................ 42, 45
*Rocha v. Bakhter Afghan Halal Kababs, Inc.,* 44 F.Supp.3d 337 (E.D.N.Y. 2014) ....................................................................................28
*Rohde v. Unitarian Universalist Ass'n*, 2025 WL 1921646 (E.D. Pa. Jul. 11, 2025)........................................................................10
*Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604 (1987).........................................46
*Salinas v. United States*, 522 U.S. 52 (1997)...........................................................54
*Samano v. Temple of Kriya,* 166 N.E.3d 250 (Ill. App. (1st) 2020).........................31
*Savin v. San Francisco*, 2017 WL 2686546 (N.D. Cal. Jun. 22, 2017)...................13
*Schleicher v. Salvation Army,* 518 F.3d 472 (7th Cir. 2008)...................................14
*Shaliehsabou v. Hebrew Home of Greater Wash.,* 363 F.3d 299 (4th Cir. 2004)......................................................................................... 10, 13
*Shane v. Fauver*, 213 F.3d 113 (3d Cir. 2000) .........................................................60
*Singh v. Uber*, 939 F.3d 210 (3d Cir. 2019) ...................................................... 57, 58
*Smith v. Berg*, 247 F.3d 532 (3d Cir. 2001)....................................................... 21, 54
*Spilman v. The Salvation Army,* 340 Cal.Rptr.3d 679 (Ct. App. Jan. 6, 2026)........31
*Taylor v. Salvation Army*, 110 F.4th 1017 (7th Cir. 2024) ......................... 37, 38, 40
*Tegete v. Maryknoll Sisters of Saint Dominic, Inc.*, 2023 WL 2504744 (S.D.N.Y. Mar. 14, 2023).....................................................................44
*Todaro v. Twnshp. of Union,* 27 F.Supp.2d 517 (D.N.J. 1998) ........................ 25, 26
*Treminio v. Crowley Mar. Corp.*, 707 F. Supp. 3d 1234 (M.D. Fla. 2023)..............42
*U.S. v. Bradley*, 390 F.3d 145 (1st Cir. 2004) .........................................................33
*U.S. v. Dann*, 652 F.3d 1160 (9th Cir. 2011)............................................................35
*U.S. v. Epstein*, 91 F.Supp.3d 573 (D.N.J. 2015).........................................................
*U.S. v. Kozminski*, 487 U.S. 931 (1988)...................................................................33

*U.S. v. Toviave*, 761. F.3d 623 (6th Cir. 2014) ....................33
*Valli v. Avis Budget Grp.*, 162 F.4th 396 (3d Cir. 2025)....................56
*Velez v. Sanchez,* 693 F.3d 308 (2d Cir. 2012) ....................28
*Vidal v. Advanced Care Staffing*, 2023 WL 2783251 (E.D.N.Y. Apr. 4, 2023) .......58
*Wallace v. Powell*, 2010 WL 3398995 (W.D. Pa. Aug. 24, 2010) ....................52
*Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77 (3d Cir. 2011)....................6
*Wen v. SanQuest, Inc.*, B, 2025 WL 276750 (N.D. Tex. Jan. 23, 2025) ....................36
*White v. Samsung Elecs.*, 61 F.4th 334 (3d Cir. 2023).................... 55, 56

**Statutes**

18 U.S.C. § 1589 .................... *passim*
18 U.S.C. § 1590 .................... 32, 45
18 U.S.C. § 1591 ....................37
18 U.S.C. § 1592 .................... 32, 43
18 U.S.C. § 1595 .................... 32, 37
18 U.S.C. § 1597 .................... 32, 43
18 U.S.C. § 1962 ....................54
18 U.S.C. § 1594 ....................32
29 U.S.C. § 201 *et seq* .................... *passim*
29 U.S.C. § 255 ....................21
42 U.S.C. § 1981 .................... *passim*
820 ILCS 105/3(5) ....................31
N.J. Stat. § 34:11-56a4....................15

**Other Authorities**

Human Rights Watch, *Caste Discrimination: A Global Concern* (2001), https://www.hrw.org/reports/2001/globalcaste/caste0801-03.htm ....................47
Kevin Brown and Sukhadeo Thorat, *Distinguishing the Caste-Race Debate in the United States from South Asia,* 66 ARIZ. L. REV. (Winter 2024)....................48
Kevin Brown et al., *Does U.S. Federal Employment Law Now Cover Caste Discrimination Based on Untouchability?*, 46 N.Y.U. REV. OF L. & SOC. CHANGE 117 (2022) ....................48
Minority Rights Grp., *Adivasis*, https://minorityrights.org/minorities/adivasis-2 ....................47

Prilali Sur, *Under India's caste system, Dalits are considered untouchable. The coronavirus is intensifying that slu*r, CNN.com (Apr. 16, 2020), https://www.cnn.com/2020/04/15/asia/india-coronavirus-lower-castes-hnk- .....47

**Rules**

Castner Indiv. R. & Proc. Pt. II ....................60
Fed. R. Civ. P. 15 ....................60
Fed. R. Civ. P. 8 ....................39
Fed. R. Civ. P. 23 ....................17

**Regulations**

12:55-1.1(c)(1) ....................30
N.J.A.C. 12:56-1.1(c)(1) ....................30

**INTRODUCTION**

Plaintiffs – immigrant workers brought to the U.S. to do construction work for Defendants – filed this case in 2021, alleging serious violations of the Trafficking Victims Protection Act ("TVPA") and state and federal wage and hour laws, among other laws. Plaintiffs allege that Defendants confiscated their passports, restricted their movements, and paid them as little as $1.20 per hour for grueling manual labor. Now, nearly five years later and after Defendants' requested TVPA stay was finally lifted—and relying on more than 250 pages of extraneous material (some in Hindi with no translation)—Defendants[1] seek dismissal of all of Plaintiffs' claims with no discovery.

Defendants in essence seek to win summary judgment via a motion to dismiss: introducing extensive materials outside of the pleadings, seeking dismissal based on an affirmative defense not apparent on the face of the Complaint, citing summary judgment cases, and arguing that Plaintiffs must "establish" their claims. Then, for the first time on this motion, they assert a right to arbitrate any claims that this Court does not dismiss on their merits. The Court should reject this attempt to deprive

[1] All Defendants other than Bochasanwasi Shri Aksharpurushottam Swaminarayan Sanstha (an India Public Trust) ("BAPS India") and Harshad Chavda bring the instant motion and are referred to herein as "Defendants."

Plaintiffs of their long-awaited opportunity to prove their case. These are serious claims. They should not be treated as lightly as they are in Defendants' brief.

As discussed below, Plaintiffs have plausibly alleged all their claims. Under the standards applicable on a motion to dismiss, Defendants' motion must be denied.

## FACTUAL BACKGROUND

Plaintiffs in this case are Indian nationals from historically marginalized groups including Scheduled Castes (Dalit) and Scheduled Tribes (Adivasi), who were brought to the U.S. to work for Defendants, including Defendant BAPS Shri Akshar Purushottam Swaminarayan Sanstha, Inc. ("BAPS U.S.").[2] 2d Am. Compl. ("SAC"), ECF No. 26, ¶¶ 20, 26, 28, 29, 36, 46, 49, 50, 51. Plaintiffs and other class members did stonework and other manual labor at BAPS locations throughout the U.S. *Id.* ¶¶ 1–4. The workers worked a punishing schedule. For example, in New Jersey, they regularly toiled more than 87 hours per week but were paid only $50 in cash per month (with an additional $375-$400 per month sent to workers' bank accounts in India). *Id.* ¶¶ 5, 203–204.

---

[2] Defendants who have appeared to date are BAPS, Inc. (referred to in the SAC as BAPS Swaminarayan Sanstha), BAPS Mercer LLC, BAPS Robbinsville LLC, BAPS Fellowship Services, Inc., BAPS Atlanta, LLC, BAPS Chino Hills, LLC, BAPS Development, Inc., BAPS Houston, LLC, BAPS Chicago, LLC, Bharat Patel, Pankaj Patel, Kanu Patel, Rakesh Patel, and Prashant Darshan Das Sadhu. Plaintiffs' motions for alternative service on the two Defendants in India, BAPS India and Harshad Chavda and are pending. ECF Nos. 85 & 91.

Plaintiffs' work was procured through Defendants' years-long scheme to obtain large numbers of Indian laborers for construction work in the U.S. while disguising them as "religious workers" under the R-1 visa program. *Id.* ¶¶ 2–4, 55–100, 101-115, 150-153, 171-176. The R-1 program permits individuals to come to the U.S. temporarily to work as ministers or in religious vocations/occupations; sponsoring organizations must submit sworn petitions to U.S. immigration officials to obtain the visas. *Id.* ¶¶ 4, 139–144. BAPS U.S. and related individuals/entities submitted sworn materials mischaracterizing workers who were actually wage-earning manual laborers as religious volunteers/workers. The U.S. Citizenship and Immigration Services and the U.S. Consulate then relied on those misrepresentations to approve the petitions and issue the R-1 visas. *Id.* ¶¶ 150–154.

Workers were induced to come to the U.S. based on false descriptions of work and conditions; they were told they would work far shorter days and fewer days per month than what was actually required. *Id.* ¶¶ 165–167. Plaintiffs and the other workers were required to sign lengthy "agreements" drafted unilaterally by Defendants (often in English, which workers did not understand) without time to review them. *Id.* ¶¶ 161–164. They were also coached for visa interviews to, *inter alia*, describe their work as religious volunteering and to say they would not be paid. *Id.* ¶¶ 170–171, 173-176. In fact, the workers came to the U.S. to work for wages,

not for religious motives, and the R-1 process was used to bring them for paid manual labor. *Id.* ¶¶ 4, 172.

At the Robbinsville, New Jersey work site, Defendants' agents maintained possession of workers' passports throughout their recruitment and deprived the workers of their passports for the duration of their U.S. labor. *Id.* ¶¶ 183, 185–187. Workers were subjected to fines and wage deductions for alleged rule infractions, reducing their already low wages. *Id.* ¶¶ 5, 209–210. Restrictive rules—such as bans on speaking with outsiders or visitors and prohibitions against leaving the guarded and video-monitored temple premises—were enforced through threats of wage deductions, being sent back to India, and other discipline. *Id.* ¶¶ 7-9, 218-220, 237–240. Workers were told the police would arrest them if they left because they did not have their passports, and that Defendants would not be responsible for what happened to them if police arrested them. *Id.* ¶ 221.

Comparable confinement and underpayment occurred at other BAPS sites as well. In Los Angeles, Chicago, Houston, and Atlanta, workers labored at least eight hours per day, seven days per week, with about one day off per month, and still earned hourly wages far below applicable minimum wages. *Id.* ¶¶ 6, 244, 249, 254, 259. Housing at those sites was likewise controlled; workers could not leave the compounds unescorted, and they could not leave their BAPS employment. *Id.*

¶¶ 242, 246–247, 251–252, 256–257, 261–262. The workers at these sites also earned very low wages. *Id.* ¶¶ 245, 250, 255, 260.

Defendants continued to control workers even after workers' returns to India, by retaining passports, requiring them to provide "financial guarantees" that other workers would return, and imposing large fines when guaranteed workers did not return. *Id.* ¶ 215. BAPS agents in India still held some workers' passports long after the workers' return. *Id.* ¶¶ 215, 270.

## **RELEVANT PROCEDURAL BACKGROUND**

This case was filed in May 2021. The initial Plaintiffs' Complaint asserted claims under the TVPA, the Fair Labor Standards Act ("FLSA"), and related state laws. ECF No. 1. On October 23, 2021, Plaintiffs filed a First Amended Complaint naming additional Plaintiffs and Defendants, classes, and claims related to additional temple locations, and adding claims under 28 U.S.C. § 1981 and the Racketeer Influenced and Corrupt Organizations Act ("RICO"). ECF No. 20. Plaintiffs filed the operative Second Amended Complaint on February 3, 2022, solely to correct the names of two Defendants prior to attempting foreign service. ECF No. 26.

On November 22, 2021, those Defendants who have appeared (hereinafter, "Defendants") moved for a stay of the action pursuant to the TVPA, 18 U.S.C. § 1595(b)(1), with Plaintiffs' consent. ECF No. 21. The parties' stipulation also tolled the FLSA claims of all potential opt-in plaintiffs. ECF No. 21-2. The case was

immediately stayed by the Court's Order. ECF No. 22. On October 28, 2025, the Court lifted that stay. On December 8, 2025, Defendants served the instant motion.

## LEGAL STANDARD

A Rule 12(b)(6) motion to dismiss "may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiffs, a court finds that plaintiff's claims lack facial plausibility." *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011). To avoid dismissal, a complaint must simply plead "enough facts to state a claim of relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In deciding the motion, a court "generally may not consider matters extraneous to the pleadings" except documents "integral to or explicitly relied upon in the complaint." *Red Hawk Fire & Sec. v. Siemens Indus.*, 449 F.Supp.3d 449, 461 (D.N.J. 2020) (cleaned up). "The defendant bears the burden of showing that no claim has been presented." *Hedges v. U.S.*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir. 1991)).

## ARGUMENT

### I. Defendants' Premature Arguments Must be Rejected.

#### A. The Court Cannot Rely on Defendants' Religious Documents.

As noted above, it is improper to consider documents outside the pleadings on a motion to dismiss. Here, Defendants submit 259 pages of documents (in English

and Hindi)[3] purporting to describe various religious tenets. D. Br. 1-2, 12-14 & Patel Decl., Ex. 1. These are not records that the Court can take judicial notice of, *see Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1197 (3d Cir. 1993), and are documents outside the pleadings which the Court should not consider.[4] At the very least, Plaintiffs must have the chance to engage in discovery, including potential expert discovery, to fully address Defendants' religious assertions. The Court should disregard the documents and arguments based on them.

---

[3] In his declaration, defense counsel Pravin R. Patel indicates that Defendants "are preparing translations of these sections [pages 51-246] and will provide them to Plaintiffs." Patel Decl. n.1. To date, however, no translations have been provided to Plaintiffs' counsel, another reason the Court should disregard these documents. *See, e.g., Kim v. Chung Sook Lee,* 2019 WL 4688692, *2 (S.D.N.Y. Sep. 24, 2019) (documents attached to pleadings must be translated, despite the lack of a local rule addressing this); *U.S. v. Morales-Madera,* 352 F.3d 1, 7 (1st Cir. 2003).

[4]Defendants argue that the "Court can take judicial notice of facts regarding religious tenets," D. Br. 1 n.2, but the cited cases take judicial notice of much more limited points. *See, e.g., U.S. v. Epstein*, 91 F.Supp.3d 573, 591, n.12 (D.N.J. 2015) (taking notice of the figure of Maimonides); *Malik v. Kindt*, 1997 WL 39429, *3 (10th Cir. 1997) (taking notice in *pro se* complaint of role played by the Jumu'ah services in Islam); *Hearn v. Kennell*, 2009 WL 3460455, *2 n.3 (C.D. Ill. Oct. 22, 2009) (taking notice "that the Islam religion requires that Muslims abstain from pork or pork-by-products"); *compare U.S. v. Simon*, 842 F.2d 552, 555 (1st Cir. 1988) (declining to take judicial notice that "Rastafarians use marijuana as part of their religion.").

### B. It Would be Premature for the Court to Consider the Ministerial Exception, Which in Any Event Does Not Apply Here.

#### 1. The Ministerial Exception, a Defense Not Apparent From the Operative Complaint, Does Not Support Dismissal.

The ministerial exception[5] is an affirmative defense that can only be addressed on a motion to dismiss if the defense is "apparent on the face of the complaint" and documents relied on therein. *Bohus v. Restaurant.com, Inc.*, 784 F.3d 918, 923 n.2 (3d Cir. 2015) (citation omitted). Here, Defendants attempt to dismiss Plaintiffs' whole case based on the ministerial exception. D. Br. 1-2, 12-14. They flatly state that "the creation of a stone mandir is an *undisputably* religious act. It is not viewed as construction work. It is not even viewed as work," *id.* at 13 (emphasis added). However, that principle is in no way apparent on the face of the SAC, just as the applicability of the ministerial exception itself is not apparent on the face of the SAC. If it were, Defendants would not need to resort to their voluminous submission to explain their religious positions.

The Court need not engage in further analysis based on the ministerial exception: dismissal based on this affirmative defense is simply unwarranted

---

[5] The Supreme Court has delineated a First Amendment bar to certain claims of employees who are ministers because adjudicating such claims involves interference with the ability of churches to choose their ministers, risking excessive entanglement of government with religion. *See Our Lady of Guadalupe Sch. v. Morrissey-Berru,* 591 U.S. 732 (2020) ("*Our Lady*")*; Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC,* 565 U.S. 171, 188-189 (2012).

considering the (partially-untranslated) extraneous documents Defendants rely upon in support of that defense. But even if the Court continues its analysis, it is clear Defendants have failed to show dismissal is warranted based on the ministerial exception affirmative defense. Plaintiffs plausibly allege that they did not perform religious work. SAC ¶¶ 174-76, 191. Plaintiffs also allege that many, if not most, of the R-1 workers were not even followers of BAPS and were not engaged in a religious vocation or occupation. *See id.* ¶ 4 ("Plaintiffs and other R-1 workers performed solely manual — not religious — labor at the temples, nearly all were not members of Defendants' denomination, and they were not volunteers."); *id.* ¶¶ 152, 172. And, while BAPS U.S. may be a religious entity, many Defendants are for-profit non-religious entities, so the ministerial exception does not apply to them.

Plaintiffs allege that Defendants' representations in the R-1 applications, and the representations they instructed Plaintiffs to make to the U.S. Embassy regarding the nature of their work, were false. *Id.* ¶¶ 150-53, 170-75. They also allege that the agreements Plaintiffs were required to sign misrepresented the work to be performed and were not even made available to Plaintiffs in a language they understood. *Id.* ¶¶ 161-65; *see Alcazar v. Corp. of the Cath. Archbishop of Seattle*, 627 F.3d 1288, 1292 (9th Cir. 2010) ("if a church labels a person a religious official as a mere 'subterfuge' to avoid statutory obligations, the ministerial exception does not apply"). Defendants' reliance on their own misrepresentations to the government

does not bolster their affirmative defense; discovery will confirm Defendants' representations to the government were indeed a subterfuge.

Moreover, courts have found that certain types of employment claims do not implicate the ministerial exception.[6] Courts have also distinguished between situations that could impact a religious entity's mission and those where the government is simply regulating acts.[7] For example, there is no Establishment Clause issue when the government requires employers to comply with requirements such as safety inspections. *Alamo,* 471 U.S. at 305. Additionally, it is settled that secular employees of religious employers are not covered by the ministerial exception. *See Shaliehsabou v. Hebrew Home of Greater Wash.,* 363 F.3d 299, 307 (4th Cir. 2004) (collecting cases). The bottom line is "whether application of the state or federal law will limit [the employer's] right to choose who performs

---

[6] *See, e.g.*, *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 305-06 (1985) (FLSA recordkeeping requirements); *Demkovich v. St. Andrew the Apostle Par.*, 3 F.4th 968, 983 (7th Cir. 2021) (tort claims); *Dole v. Shenandoah Baptist Church,* 899 F.2d 1389, 1400 (4th Cir. 1990), *cert. denied*, 498 U.S. 846 (1990) (FLSA claim); *Rohde v. Unitarian Universalist Ass'n*, 2025 WL 1921646, *10 (E.D. Pa. Jul. 11, 2025) (breach of contract claim).

[7] *See Emp't Div. v. Smith,* 494 U.S. 872, 878-79 (1990) (religious beliefs do not excuse non-compliance with neutral, generally applicable law regulating peyote); *Hernandez v. Comm'r,* 490 U.S. 680, 697-98 (1989) (no religious entanglement to apply neutral tax law); *Prince v. Mass.*, 321 U.S. 158 (1944) (upholding conviction of parent for child labor violations committed as part of religious beliefs).

particular spiritual functions on its behalf." *Petruska v. Gannon Univ.*, 462 F.3d 294, 307 (3d Cir. 2006).

**2. Plaintiffs and the Other R-1 Workers Were Not Ministers.**

The ministerial exception applies only to "certain key employees" whose work "lie[s] at the core of [the employer's] mission." *Our Lady,* 591 U.S. at 756. Plaintiffs are not that type of employee. The Supreme Court has identified four key considerations as to whether an employee is a minister, but none are dispositive: (1) whether the employee has the title of minister; (2) whether the position requires considerable religious training and "commissioning"; (3) if the employee was called to religious service and claimed accompanying tax benefits; and (4) if the job duties involved conveying the message of the religion and carrying out its mission. *Id.* at 750-51.

Other considerations include whether an employee is part of the same religion represented by their employer, and the time the employee spends on religious activities. *Id.* at 761-62; *Hosanna-Tabor,* 565 U.S. at 193-94. Where an employer labels its employee a minister "as a mere 'subterfuge' to avoid statutory obligations, the ministerial exception does not apply." *Alcazar,* 627 F.3d 1288 at 1292.

Based on the SAC, Plaintiffs do not meet *any* of the factors for being ministers. First, there is no allegation that they had the title of minister. While Plaintiffs were labeled as religious volunteers in Defendants' R-1 applications, they

allege that this was a subterfuge to bring them to the U.S. and exploit them. SAC ¶¶171-72. But Defendants cannot rely on the "Agreements" when the SAC contains allegations that the representations therein were part of Defendants' scheme to bring Plaintiffs to the U.S. under false pretenses.[8] *Alcazar,* 627 F.3d at 1292.

As to the second and third factors, nowhere in the SAC is there any reference to any religious training or any allegation that Plaintiffs were "commissioned." Plaintiffs do not plead facts alleging that they were "called" to religious service or that they claimed any related tax benefits. And with respect to the final factor, it is not appropriate at the motion to dismiss stage to – as Defendants would have the Court do – determine that Plaintiffs' job duties involved conveying the church's message or carrying out its mission. To the contrary, Plaintiffs' work was categorically not ministry, and discovery will confirm this.

**3. Not All Defendants are Religious Entities.**

Defendants claim that BAPS U.S. is a "religious denomination of Hinduism in the U.S." D. Br. 1. Defendants then state, in a footnote and without citation, that "Domestic Defendants are religious entities that operate Hindu mandirs across the United States and individuals who have supervised religious volunteer work." D. Br. 1 n. 1. However, Defendants' motion fails to identify anything in the SAC

[8] Plaintiffs also have no way of knowing whether the "Agreements" submitted by Defendants are the same ones that they were rushed into signing.

showing, for example, that the for-profit companies are religious entities. For example, Plaintiffs allege that Defendant BAPS Mercer, BAPS Robbinsville, BAPS Atlanta, BAPS Chino Hills, BAPS Development, BAPS Houston, and BAPS Chicago were companies that owned temple property. SAC ¶¶ 58, 62, 69, 78, 84, 86, 96. *See, e.g., Savin v. San Francisco*, 2017 WL 2686546, *6-7 (N.D. Cal. Jun. 22, 2017) (denying motion to dismiss where plaintiff alleged joint employment by non-religious entity covered by the statute in question). The SAC does not support dismissal based on the Defendants' status as religious entities.

**4. The Ministerial Exception Does Not Apply to Plaintiffs' Specific Claims.**

Despite Defendants' contentions, the ministerial exception does not bar Plaintiffs' FLSA claims. *Alamo* 471 U.S. at 301-02.[9] The DOL's Field Operations Handbook describes an exception to the definition of an employee under the FLSA only for persons who are "members of religious orders who serve pursuant to their religious obligations in schools, hospitals, and other institutions operated by their church or religious order." *Shaliehsabou*, 363 F.3d at 305. It does not apply to persons engaged in the commercial activities of a religious organization, nor to

---

[9] While there is a ministerial exception to the FLSA, it is not based on the First Amendment. Instead, it stems from Congressional debates over the adoption of the Act, as well as language in the U.S. Department of Labor's Wage and Hour Field Operations Handbook. *See Shaliehsabou*, 363 F.3d at 305-06.

secular employees of religious employers. *Id.* at 307; *see also Schleicher v. Salvation Army,* 518 F.3d 472, 475-76 (7th Cir. 2008). Courts look to the primary duties of the employee to determine whether they are covered by the exception. "[A]s a general rule, if the employee's primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship, he or she should be considered 'clergy.'" *Id.* at 306. Plaintiffs allegations plausibly show that that they did not do this type of religious work. At the very least, discovery should be allowed on this issue, and the Court should not dismiss.

Plaintiffs' state wage and hour claims are similarly not subject to the ministerial exception. Instead, they are akin to breach of contract claims and rely on allegations that Defendants promised, and failed, to pay them a particular wage. *See, e.g., Bigelow v. Sassafras Grove Baptist Church,* 247 N.C.App. 401, 409 (N.C. Ct. App. 2016) (ministerial exception does not apply to state wage claims because they are based on a contractual obligation); *Lorenzo v. San Francisco Zen Center,* 116 Cal.App.5th 258, 275 (1st Dist. Ct. App. 2025), *pet. for rev. filed* Dec. 30, 2025 (plaintiff seeking unpaid wages for work in commercial activities not covered by ministerial exception under California's wage and hour law). New Jersey's wage laws do not include a statutory ministerial exception, and no court has found a common law exception. *Keeley v. Loomis Fargo & Co.*, 183 F.3d 257, 267 (3d Cir.

1999) ("the text of the New Jersey Wage and Hour Law plainly covers 'every employer' except those explicitly exempted by the legislature"); N.J. Stat. § 34:11-56a4. Plaintiffs' state wage and hour claims are based on an agreement to pay wages, and do not require the court to entangle itself in religious governance, *Keeley*, 183 F.3d at 273, so should not be dismissed.

Plaintiffs' trafficking claims similarly should not be dismissed based on the ministerial exception. Only a few courts have considered whether trafficking claims are subject to the ministerial exception. In *Shukla v. Sharma,* the court examined whether it prevented a Hindu priest in the U.S. on an R-1 visa from raising TVPA claims. 2009 WL 10690810, **6-7 (E.D.N.Y. Aug. 21, 2009). Noting that "exploring the ills that the TVPA is meant to combat – namely, trafficking and forced labor – does not require courts to unduly interfere with the internal affairs of religious organizations or get involved in the selection or retention of ministers," *id.* at *6, the court found his claims not subject to any such exception. *Id.* at *7 ("declin[ing] to apply the ministerial exception to P's claim under the TVPA").[10] Defendants do not

[10] The court wrote, "The type of abuse addressed by the TVPA is so extreme, offensive, and contrary to fundamental human rights as to distinguish it from the type of conduct that ordinarily gives rise to violations of labor and employment laws. Given the relative magnitude of the deprivation of individual liberty in cases covered by the TVPA, and the international scope and significance of human trafficking, the TVPA transcends the boundaries of the ministerial exception." *Id.* at *7.

argue that their confiscation of Plaintiffs' passports, restricting their freedom of movement, and monitoring Plaintiffs' activities with security cameras and guards were religiously-mandated practices, and Plaintiffs were not ministers. Their TVPA claims should proceed.

### C. Defendants' Bid to Dismiss Class Allegations is Premature and Plaintiffs Plausibly Plead All Class Claims.

#### 1. Plaintiffs Sufficiently Plead a Rule 23 Class and Defendants' Motion is Premature.

Plaintiffs' detailed SAC easily clears the threshold for plausibly setting forth class claims, containing numerous facts that, accepted as true as they must be on a motion to dismiss, state class claims to relief that are plausible on their face. Defendants' motion is premature and an improper attempt to obtain a court ruling on questions of certification before Plaintiffs have so moved.

It is well settled that "[a] motion for class certification is a more appropriate vehicle for arguments about class propriety" than a motion to dismiss or strike class claims. *Gray v. BMW of N. Am., LLC*, 22 F.Supp.3d 373, 386 (D.N.J. 2014). "Class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action, and discovery is therefore integral." *Id.* at 386 (denying Defendant's motion to strike as premature, and citing *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 160, (1982)). Put simply, "the time to object to the Plaintiff's proposed class definition is if and when

the Plaintiff moves to certify a class." *Bradshaw v. CHW Grp., Inc.*, 763 F.Supp.3d 641, 651 (D.N.J. 2025). The Court should reject Defendants' motion on those grounds alone.

Nonetheless, Plaintiffs' pleading that hundreds of individuals performing stonework and construction were subject to the same policies and practices designed to extract work from them in dangerous, highly controlled contexts, for unlawfully little pay, satisfies Rule 23(b)(3), and should certainly survive Rule 12(b)(6) review. SAC ¶¶ 184-185; 193, 218, 221, 241, 247, 251-252, 256-257, 261-262, *et. seq.*.

**2. Plaintiffs Do Not Plead a Fail-Safe Class.**

Plaintiffs do not plead fail-safe classes. A class is fail-safe if it is "defined so that whether a person qualifies as a member depends on whether the person has a valid claim." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 167 (3d Cir. 2015)(quoting *Messner v. Northshore Univ. HealthSystem,* 669 F.3d 802, 825 (7th Cir. 2012). Plaintiffs' proposed classes do not do this but plainly identify the classes as: "All individuals who worked in non-supervisory roles at the [] temple as construction and/or stone workers under R-1 visas between [dates]." SAC ¶¶ 287-291. [11]

[11] Plaintiffs plead a separate class of workers at each location. *Id.* ¶¶ 289-291. The class definitions are identical, save for the work location (shown here as "[]").

Defendants strangely claim that Plaintiffs' classes "assume that every artisan *was treated unlawfully*, was not a religious minister, and was injured by Defendants' alleged conduct." D. Br. 52 (emphasis added). It is unclear where in the proposed class definitions Defendants find this purported assumption. The classes include individuals who literally did construction work or stone work; this is readily identifiable and involves no assumption or assertion about the lawfulness of their treatment. And the descriptive use of the term "worked" in the class definitions is not sufficient to make a class that depends on workers' ultimate legal status—whether as employees, contractors, or volunteers—"fail-safe." *See Gamboa v. KISS Nutraceuticals*, 777 F.Supp.3d 1210, 1224-1225 (D. Colo. 2025).

The Court, Defendants, and potential litigants are reasonably on notice from the class definitions who is a member of the relevant classes; that is all that is required in a complaint. *See Byrd*, 784 F.3d at 164. Similarly, nothing in the class definitions incorporate or require the Court to determine at this early stage of the case whether each person felt threatened or how they were treated.

**3. Plaintiffs Plausibly Plead the Rule 23 Requirements of Commonality, Superiority, & Numerosity.**

While the Court need not reach this issue, and Defendants' attempt to short-circuit the class certification process should be rejected, Plaintiffs adequately allege and will be able to establish the predominance of common questions and superiority

of class adjudication. Plaintiffs allege that class members were: (1) specifically recruited from the same country and castes; and (2) subjected to similarly long hours for low wages and similarly coercive and threatening policies—including at recruitment—like withholding passports, physically isolating workers, and threatening workers with fines, termination, and arrest. *See, e.g.*, SAC ¶¶ 184-185; 193, 218, 221, 241, 247, 251-252, 256-257, 261-262.

Defendants are wrong to claim that class treatment is impossible in TVPA forced labor cases.[12] In fact, courts routinely certify TVPA class actions where victims are subjected to the application of broader policies. *See, e.g.*, *Menocal v. GEO Grp., Inc.,* 882 F.3d 905, 914 (10th Cir. 2018) (upholding class certification for detainees required to perform cleaning tasks on the threat of discipline); *Owino v. CoreCivic, Inc.*, 60 F.4th 437, 444 (9th Cir. 2022) (upholding a class of detainees subject to similar sanitation policies); *Paguirigan v. Prompt Nursing Emp. Agency LLC*, 2018 WL 4347799, *4 (E.D.N.Y. Sept. 12, 2018) (class certified for nurses recruited in the Philippines and coerced to work by fees).

Defendants are also wrong as to the class treatment of wage and hour and discrimination claims, both of which again are routinely certified, especially where

[12] Notably, Defendants cite to an ADA case, not TVPA case, for this contention. *See Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 489 (3d Cir. 2018) (finding commonality not satisfied for class including persons with varying disabilities).

workers were subject to the same or similar policies. *See, e.g.*, *Charlot v. Ecolab, Inc.*, 2019 WL 6888621, *17 (D.N.J. Dec. 17, 2019); *Moore v. Primecare Med. Inc.*, 2020 WL 1248976 **4-5 (W.D. Penn. March 16, 2020). Defendants cite to out-of-circuit cases stating that alleging a mere violation of the same law or a "culture" of favoritism are not sufficient for class certification, but this is not what Plaintiffs allege. D. Br. 55, citing, *e.g.*, *Mielo,* 897 F.3d at 489. The other cases Defendants cite are similarly inapposite.[13]

Plaintiffs have also plausibly alleged numerosity.[14] Confusingly, Defendants suggest that Plaintiffs have failed to adequately allege that the proposed classes

---

[13] *See Bennet v. Nucor Corp.*, 656 F.3d 802, 813-14 (8th Cir. 2011) (failing to overturn the court's denial of class certification where defendant had "'presented overwhelming evidence' of '[d]ecentralized decision making,' and ... 'diversity of employment practices, job classifications, and functions among the production departments '".); *Bolden v. Walsh Const. Co.*, 688 F.3d 893 (7th Cir. 2012) (reversing certification where plaintiffs pled claims based on supervisors' actions or inactions across over 250 worksites and plaintiffs conceded to material differences in worksites during depositions); *Ellison v. Inova Health Care Servs.*, 692 F.Supp.3d 548, 565 (E.D. Va. 2024) (striking class claims of failure to accommodate, which require each worker to prove a bone fide religious belief that was communicated to the employer).

[14] Specific Plaintiffs withdrawing from the lawsuit, under still-unknown circumstances, does not make class treatment inappropriate. Courts have routinely recognized that defendants may enact undue influence over potential class members, and that individual class members opting out does not defeat a class. *See Morden v. T-Mobile USA, Inc*, 2006 WL 2620320, at *3 (W.D. Wash. Sept. 12, 2006); *Jenson v. Eveleth Taconite Co.*, 139 F.R.D. 657, 664 (D. Minn. 1991); *see also Mevorah v. Wells Fargo Home Mortg., Inc., a div. of Wells Fargo Bank*, 2005 WL 4813532, at *1 (N.D. Cal. Nov. 17, 2005) (recognizing the risk for employer coercion of potential class members pre-certification).

exceed 40 persons, but that is incorrect. In the numerosity section of the SAC, Plaintiffs allege that there were over 200 individuals who worked in Robbinsville and at least 100 at each of the four other locations. SAC ¶¶ 293-97. Defendants have admitted, that "U.S. Government officials have authorized the use of R-1 visas for individuals to travel to the United States to perform volunteer services at BAPS temples for 20 years . . . ." ECF No. 21-1 at 5. Defendants have also acknowledged there was a federal criminal investigation of the Robbinsville temple, during which 90 workers were removed from the temple.[15]

## II. Plaintiffs State Plausible Claims.

### A. Plaintiffs Plausibly Plead FLSA and State Wage and Hour Claims.

#### 1. Plaintiffs' FLSA and State Wage Claims Are Not Time Barred.

Under the FLSA, the statute of limitations allows claims going back two years from commencing an action or three years if, as alleged here, the employer acted "willfully." *See* 29 U.S.C. § 255(a). The state law claims alleged here have statutes of limitations which run from six years to three years. *See* N.J.S.A. 34:11-56a25.1

[15] Further, Defendants' cases address Rule 23(b) requirements in the context of appealing a granted class certification, not the pleading stage. *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 358 (3d Cir. 2013); *Mielo,* 897 F.3d at 486. Again, Defendant's motion is premature. *Bradshaw*, 763 F.Supp.3d at 651; *Smith*, 2014 WL 5026321, *8; *In re Hydrogen Peroxide Antitrust Litig*., 552 F.3d 305, 318 (3d Cir. 2008); *Barghout v. Bayer Healthcare Pharm.*, 2012 WL 1113973, *10 (D.N.J. March 30, 2012).

(6 years, previously 2 years); *Guimaraes v. Metal Transp., LLC,* 790 F. Supp. 3d 389, 402 (M.D. Pa. Jul. 10, 2025) (New Jersey Supreme Court would apply six year statute of limitations to NJWPL claims); Cal. Code Civ. Proc. Sec. 338 (three years); 820 ILCS 105/12 (three years). And the parties already agreed to tolling of FLSA claims during the pendency of the TVPA stay.

Importantly, however, a court can also equitably toll the statute of limitations for a FLSA claim—as Plaintiffs have sought here—and "rescue a claim otherwise barred as untimely . . . when a plaintiff has been prevented from filing in a timely manner due to sufficiently inequitable circumstances." *Ojeda v. Louis Berger Group (Domestic), Inc.,* 2020 WL 5757805, *1 (D.N.J. Sep. 28, 2020) (internal quotation removed). Equitable tolling is also available under New Jersey, Illinois, and California law. *See, e.g.*, *Min Fu v. Hunan of Morris Food, Inc.,* 2019 WL 1275059, *3-4 (D.N.J. Mar. 20, 2019); *Kwai Fun Wong v. Beebe,* 732 F.3d 1030, 1052 (9th Cir. 2013), *aff'd, U.S. v. Kwai Fun Wong,* 575 U.S. 402 (2015); *Cada v. Baxter Healthcare Corp*., 920 F.2d 446, 450-53 (7th Cir. 1990).

Here, Plaintiffs have alleged that

> The Employer Defendants, through their wrongful and illegal conduct, prevented Plaintiffs and other R-1 workers from asserting their legal claims while the Employer Defendants employed Plaintiffs. As a result, *the statute of limitations for Plaintiffs' FLSA claims, New Jersey Wage & Hour Law and Wage Payment Law claims, California Labor Code claims, Illinois Minimum Wage Law claims, and for Plaintiffs' other*

> *claims should be equitably tolled* to allow Plaintiffs to recover for legal violations during their entire period of employment.

SAC ¶ 264 (emphasis added). The SAC plausibly alleges supporting facts which justify equitable tolling, including that: (1) Defendants did not post required notices or otherwise make Plaintiffs aware of their rights, *Id.* ¶ 263; and (2) Defendants confiscated workers' passports, restricted them from leaving the temple grounds, *id.* ¶¶ 184-87, 215–17, 221, 247, 252, 257, 262, and otherwise inhibited the prompt assertion of their rights in a timely manner. Defendants' failure to post and restrictions of Plaintiffs and other workers before, during, and after their time as R-1 workers rise to the type of circumstances where equitable tolling should apply. *See Bonham v. Dresser Indus., Inc.*, 569 F.2d 187, 193 (3d Cir. 1977) (allowing tolling in ADEA case where notice was not posted); *Ying Yang v. Vill. Super Mkt., Inc.*, 2019 WL 1275059, *3-4 (D.N.J. March 20, 2019) ("This Court has recognized in tolling similar FLSA actions that an employer's failure to post a statutorily required notice . . . tolls the running of any period of limitations.") (cleaned up). In light of Plaintiffs' equitable tolling allegations, the Court should not dismiss Plaintiffs' wage and hour claims on a motion to dismiss. This issue is properly addressed following discovery.

### 2. The Workers Here Were Covered By the FLSA, and Their FLSA Claims Should Not Be Dismissed.

#### a. The Court Should Look to Economic Realities and the Totality of the Circumstances.

The FLSA is sweeping in its coverage and remedial purpose, and its definitions are extremely broad. *See Johnson v. NCAA,* 108 F.4th 163 at 176 (3d Cir. 2024) (definition of employee in the FLSA described as "the broadest … that has even been included in any one act") (cleaned up). While the FLSA contains no statutory exemption for volunteers with nonprofit or religious organizations, courts have found that, in specific circumstances, such volunteers may not fit the definition of employee and may not be entitled to FLSA protections. In the seminal case on volunteers and FLSA coverage, *Alamo*, 471 U.S. 290 (1985), the plaintiffs worked for a religious foundation and claimed they were entitled to minimum wage. The Court applied an "economic realities" test, finding the workers were employees under the Act given: (1) the workers' receipt and expectation of in-kind benefits such as food, shelter, clothing, transportation, and medical benefits; (2) their dependency upon the foundation for long periods; and (3) the fact that the work involved commercial activities of the foundation. *Id.* at 293–301. This was true despite some workers' protests that they considered themselves volunteers. The Court noted that "[i]f an exception to the Act were carved out for employees willing to testify that they performed work 'voluntarily,' employers might be able to use superior

bargaining power to coerce employees to make such assertions, or to waive their protections under the Act." *Id.* at 302.

Lower courts have endeavored to follow *Alamo*'s reasoning, while recognizing the challenges inherent in applying an "economic realities" test to alleged volunteers and/or interns. *See, e.g.*, *Krause v. Cherry Hill Fire Dist. 13*, 969 F. Supp. 270, 274-75 (D.N.J. 1997). The Third Circuit recently wrestled with this issue in a case involving college athletes, applying something more akin to a "totality of the circumstances" test looking at factors including (1) whether the services were performed for the putative employer's benefit; (2) who had the right to control the activities; and (3) the expectation of compensation, whether express or in-kind. *See Johnson,* 108 F.4th at 178-80; *Todaro v. Twnshp. of Union,* 27 F.Supp.2d 517, 538 (D.N.J. 1998) (declining to apply the economic realities test, finding it "to be ineffectual in the context of distinguishing employees from volunteers"). Other courts have similarly used a totality of the circumstances lens in these cases.[16]

---

[16] *See, e.g., Genarie, v. PRD Mgmt.,* 2006 WL 436733, *12 (D.N.J. Feb. 17, 2006) ("[T]he definition of 'volunteer' must be viewed under a reasonableness standard and applied in 'a common-sense way … in light of the goals of the FLSA."); *Rhea Lana, Inc. v. U.S. Dep't of Labor,* 925 F.3d 521, 526 (D.C. Cir. 2019) (considering expectation of compensation, employer's control over the work, and whether services performed were integral to the business); *Padilla v. AFSCME,* 551 F. Appx. 941, 943 (10th Cir. 2014). Workers' expectation of compensation is a key consideration. *See Chavez-DeRemer v. Mennonite Messianic Mission of the E. Pa. Mennonite Church,* 2025 WL 3653555, *11 (M.D. Pa. Dec. 17, 2025); *Krause*, 969 F. Supp. at 277; *Acosta v. Cathedral Buffet, Inc.,* 887 F.3d 761, 766 (6th Cir. 2018).

Moreover, a defendant may not coerce an individual into a supposed volunteer status. *See, e.g., Genarie*, 2006 WL 436733, *12 (“a volunteer must not be a victim of coercion or undue pressure from the organization for whom the employee is performing services, but perform his or her duties for various personal reasons”); *Cathedral Buffet,* 887 F.3d 761 at 767 (“a showing of coercion might be sufficient to overcome a volunteer’s lack of expected compensation and bring her within the protections of the FLSA”); *Acosta v. Paragon Constrs. Corp.*, 884 F.3d 1225, 1231-32 (10th Cir. 2018). Another consideration that goes to employment status is whether the individuals in question worked alongside or replaced paid employees. *See, e.g., Klick v. Cenikor Found.,* 94 F.4th 362, 372 (5th Cir. 2024); *Benshoff v. City of Va. Beach,* 180 F.3d 136, 140 (4th Cir. 1999). Additionally, courts look to whether there was a subjective understanding that the individual’s services were as a volunteer. *Todaro,* 40 F.Supp.2d 226, 230.

**b. Plaintiffs Have Sufficiently Alleged that Defendants Were Engaged in Commercial Activities and the Workers Were Individually Engaged in Commerce.**

The Court should not dismiss Plaintiffs’ FLSA claims based on Defendants’ claim that “Plaintiffs have not *established* that BAPS’ activities took place for a commercial purpose,” D. Br. 42 (emphasis added). At this stage, Plaintiffs must only plausibly allege their claims, and they have done so. The Court should allow discovery and factual development on the extent to which Defendants have engaged

in commercial activities. *See Harris v. Pathways Cmty. Behavioral Healthcare*, 2011 WL 13290777, *4 (W.D. Mo. July 14, 2011) ("determination of FLSA coverage is more appropriate for the summary judgment stage, *after* the parties have had the opportunity to engage in discovery") (cleaned up); *Johnson-Medland v. Bethanna,* 1996 WL 612467, *5 (E.D. Pa. Oct. 17, 1996) (finding genuine factual dispute on summary judgment where there were competing affidavits as to whether defendant engaged in commercial activities because of insufficient discovery); *cf. Genarie*, 2006 WL 436733, *7 (denying summary judgment as to FLSA enterprise coverage where defendants "have repeatedly refused to provide information regarding their revenue" and thus "Plaintiffs have been stymied from providing evidence that [defendant] … come[s] under the purview of the FLSA.")

Moreover, Plaintiffs have alleged both that Defendants met the definition of a FLSA enterprise and that the Plaintiffs and their co-workers were individually engaged in commerce or the production of goods for commerce. SAC, ¶¶ 127-28, 267. They also allege that Defendants benefited financially from Plaintiffs' labor. *Id.* ¶ 268.[17] Plaintiffs' allegations that they engaged in constructing these sites are

---

[17] For example, the websites for the temples at issue in this case show that they engage in commercial activities. Each has a gift shop and café, and several offer catering. *See, e.g.*, https://www.baps.org/Global-Network/North-America/Robbinsville/Gifts-Snacks.aspx; https://www.baps.org/Global-

sufficient at the motion to dismiss stage to allege FLSA coverage based on both Defendants' commercial activities and Plaintiffs and putative class members' involvement in the commercial activities of Defendants. *See, e.g., Rocha v. Bakhter Afghan Halal Kababs, Inc.,* 44 F.Supp.3d 337, 346-47 (E.D.N.Y. 2014) (allegations that Plaintiff regularly handled goods in interstate commerce produced outside state sufficient to show the first prong of enterprise coverage).

**c. Plaintiffs Have Plausibly Alleged That They And Other Workers Were Employees Under the FLSA.**

Where workers receive actual compensation, whether in the form of wages or in-kind compensation, courts typically find them to be employees. *Chavez-DeRemer,* 2025 WL 3653555, *11 (receipt of stipend was an express compensation agreement that supported the finding of employee status); *Krause*, 969 F. Supp. at 277. Even an unfulfilled promise of compensation may be enough. *See Velez v. Sanchez,* 693 F.3d 308, 330 (2d Cir. 2012). When workers are paid hourly, or where their compensation otherwise depends on their output or on them following defendant's work rules, this weighs in favor of the workers being covered employees. *See Clancy v. Salvation*

Network/North-America/Atlanta/Gifts-Snacks.aspx. Should the Court determine that further allegations on this point are necessary, Plaintiffs ask that the Court grant them an opportunity to amend after discovery, *see Hanshaw v. Veterans & Medicaid Planning Grp., PLLC,* 2019 WL 3854986, **4-5 (M.D. Fla. Mar. 28, 2019) (allowing amendment to add facts connecting plaintiff's work to interstate commerce), to add additional details about Defendants' commercial activities.

*Army,* 2023 WL 1344079, *3-4 (N.D. Ill. Jan. 31, 2023); *Krause*, 969 F. Supp. at 277.

Here Plaintiffs allege that they and their co-workers were paid a regular monthly salary. SAC ¶¶ 5-6, 152, 203-204, 245, 250, 255, 260. The notifications sent to the workers about bank deposits made for them by Defendants at times referred to them as "SALARY." *Id.* ¶ 206. All workers recruited to work in the New Jersey temple were told they would be paid what the other workers at that temple were paid. *Id.* ¶ 168, including lodging provided by the Defendants. *Id.* ¶¶ 193, 242, 251, 256, 261. The workers' pay depended on their compliance with work rules, and they were docked pay for infractions. *Id.* ¶¶ 209-210, 230, 239-240.

Plaintiffs' work was also primarily for the benefit of the Defendants. This Circuit has said that "for an activity to constitute 'work' it need only be controlled by an employer and pursued necessarily and primarily for that employer's benefit." *Johnson,* 108 F.4th 163 at 178. Plaintiffs did not work for their own personal pleasure, but for wages. SAC ¶¶ 4, 152, 157, 159, 172, 211-13. Their work was strictly controlled by Defendants, who reduced their wages or took other disciplinary action if they failed to follow work rules. *Id.* ¶¶ 9, 230, 238-40,209-210, 214-216, 230, 239-240; *see also* ¶ 7-8, 10, 185-87, 217 (passports were held to force Plaintiffs to work), ¶ 218 (workers threatened with fines or expulsion from the U.S. if they talked to people outside of the temple), 219-221, 246, 252, 257, 262, 270-71.

For the above reasons, the Court should not dismiss Plaintiffs' FLSA claims.[18]

**3. The Court Should Not Dismiss the State Wage & Hour Claims.**

Plaintiffs also plausibly allege that they and the other R-1 workers were employees under the relevant state wage and hour laws, none of which contain a "commercial activities" requirement. The Court should therefore decline to dismiss Claims 4, 5, 6, and 7, especially before discovery. As to Claim 4, New Jersey State Wage and Hour Law ("WHL") creates a presumption of employee status, while the New Jersey Wage Payment Law ("WPL") invoked in Claim 5 is to be interpreted liberally in light of its remedial purpose. *Hargrove v. Sleepy's, LLC*, 220 N.J. 289, 313 (2015). While the regulations for each contain an exemption for volunteers, N.J.A.C. 12:56-1.1(c)(1) and 12:55-1.1(c)(1), neither provides a definition of a volunteer and there are no cases interpreting either exemption. However, the New Jersey Supreme Court has looked to the FLSA to interpret the WHL where the WHL does not define terms and the FLSA provisions are analogous. *Branch v. Cream-O-Land Dairy*, 244 N.J. 567 (2021); *Marquez v. Upstairs at Chef Vola, Inc.*, 2022 WL

[18] Defendants briefly argue that Plaintiffs "fail to meet the plausibility standard for their collective action," D. Br. 43, but—as with Defendants' attempts to keep Plaintiffs from pursuing a class action—this argument is premature. Plaintiffs have not yet moved for conditional certification of their FLSA claims, and Defendants' citations to the standards on a FLSA certification motion are inapplicable. *See Perez v. Express Scripts, Inc.*, 2020 WL 7654305, at *3 (D.N.J. Dec. 23, 2020).

2274471, *14 (D.N.J. Jun. 23, 2022). For the same reasons as discussed above, Plaintiffs are not volunteers under the WHL.

As to Claim 6 under California law, the two-part test for whether an individual is a volunteer are the same considerations as under the FLSA: "[T]he nonprofit must establish that (1) the worker freely agreed to work for the nonprofit to obtain a personal or charitable benefit, rather than for compensation, and (2) overall, the nonprofit organization's use of the volunteer labor is not a subterfuge to evade the wage laws." *Spilman v. The Salvation Army,* 340 Cal.Rptr.3d 679, 86-88, 91 (Ct. App. Jan. 6, 2026). Plaintiffs and other temple workers were not volunteers under California law because, as alleged and as previously discussed, they worked for compensation rather than for a personal or charitable benefit and allege that Defendants' characterization of the workers as volunteers was a subterfuge.

And as to Claim 7, there is no exclusion of volunteers under Illinois's minimum wage law, only an exemption for persons working "as a member of a religious corporation of organization." 820 ILCS 105/3(5). The exemption has been limited to "an individual whose functions are spiritual or religious, such as a priest, rabbi, minister, nun, reverend or other such individuals who perform similar functions as their primary duty." *Samano v. Temple of Kriya,* 166 N.E.3d 250, 262 (Ill. App. (1st) 2020). Plaintiffs allege that they and their co-workers were not

members of the BAPS denomination, SAC ¶ 4, and were not ministers. Therefore, the narrow religious member exception to Illinois wage law does not apply.

**B. Plaintiffs Plausibly Plead TVPA Violations.**

Plaintiffs' SAC plausibly pleads TVPA forced labor violations, supporting them with detailed factual allegations. SAC ¶¶ 43-118. Defendants, in seeking dismissal of some of the TVPA claims,[19] largely ignore those facts and spuriously contends that Plaintiffs merely present "conclusory" allegations. *See, e.g.*, D. Br. 6.

Plaintiffs seek TVPA damages for themselves and Class members under 18 U.S.C. § 1595(a), which provides a victim of the crimes set forth in 18 U.S.C. §§ 1581-1597 (Chapter 77) a private right of action to recover damages and attorneys' fees. *See* 18 U.S.C. § 1595(a). Plaintiffs bring claims for the following Chapter 77 offenses: forced labor, *id.* § 1589; trafficking for forced labor, *id.* § 1590; document servitude, *id.* §§ 1592 & 1597; attempt, *id.* § 1594(a); and conspiracy, *id.* § 1594(b). Congress enacted these prohibitions to address "a broad range of conduct" beyond that prohibited by the Thirteenth Amendment. *Burrell v. Staff*, 60 F.4th 25, 37 (3d Cir. 2023) ("That range of conduct encompasses circumstances in which the person whose labor is being exploited is faced with any number of choices as an alternative

[19] Defendants do not specifically address or argue for dismissal of Plaintiffs' TVPA attempt, conspiracy, or venture liability claims under 18 U.S.C. § 1594(a)–(b) and § 1595(a). Claims not challenged in a motion to dismiss remain in the case. *Foulke v. Twp. of Cherry Hill*, 2025 WL 1245759, *14 (D.N.J. Apr. 30, 2025).

to working, including actual or threatened physical restraint, serious harm, and abuse of law or legal process").[20] Defendants' arguments to the contrary are misinformed, ignoring a growing and near-unanimous body of caselaw.[21]

As explained further below, "the TVPA inquiry is fact specific" and requires a court to consider "all the surrounding circumstances" in evaluating TVPA claims. Because Plaintiffs here have alleged detailed facts, Defendants' bid to dismiss these claims prematurely must be denied, particularly absent discovery. *See, e.g.*, *Byron v. Avant Healthcare Professionals, LLC*, 2024 WL 2304490, *13–15 (M.D. Fla. Apr. 10, 2024) (noting that "most courts have allowed similar TVPA claims to survive a motion to dismiss" and collecting cases).

**1. Plaintiffs State a Claim for Forced Labor.**

The Plaintiffs who constructed the New Jersey BAPS compound allege the following as to their TVPA claims:

---

[20] *See Martinez-Rodriguez v. Giles*, 31 F.4th 1139, 1156 (9th Cir. 2022) (TVPA enacted to abrogate Supreme Court's narrow interpretation of 'involuntary servitude' in *U.S. v. Kozminski*, 487 U.S. 931 (1988)); *U.S. v. Bradley*, 390 F.3d 145, 150 (1st Cir. 2004) (TVPA prohibits forced labor not only by force, "but also more subtle psychological methods of coercion"), *rev'd on other grounds*, 545 U.S. 1101 (2005).

[21] For example, Defendants mischaracterize *U.S. v. Toviave*, 761. F.3d 623, 629 (6th Cir. 2014) to suggest the TVPA's sole "purpose [is] to target 'slavery and involuntary servitude.'" D. Br. 26. The Sixth Circuit's *dicta* in *Toviave* only recognizes that the Thirteenth Amendment was the constitutional basis for the forced labor statute. *Id.* It does not suggest forced labor under § 1589 is limited to slavery and involuntary servitude. In this discussion, the *Toviave* court cites multiple cases with facts closer to Plaintiffs' as examples of TVPA forced labor violations. *Id.* (collecting cases).

- Defendants misrepresented the workers' hours and the nature of their work during the recruitment and visa application process in India, SAC ¶¶ 166-167, 170-176, 184;
- Defendants took Plaintiffs' passports when they arrived in the U.S. and held them for the duration of their employment, *id.* ¶¶ 186-187, 217;
- Defendants paid Plaintiffs approximately $425 to $450 per month—the equivalent of $1.20 per hour—for that work, *id.* ¶¶ 5, 203, and sent most of Plaintiffs' wages to accounts in India, meaning Plaintiffs only had access to $50 per month, *id.* ¶¶ 203-204, 207;
- Defendants deducted fines from those wages if they felt a worker violated work rules, further reducing their available funds and compounding their precarity, *id.* ¶¶ 209-210;
- Defendants housed Plaintiffs in a fenced-in compound with guards and security cameras outside the workers' trailers and throughout the compound, *id.* ¶¶ 7, 193, 219-220, and did not allow Plaintiffs to leave the temple compound of their own free will, *id.* ¶¶ 7, 216, 221, or to speak with visitors, *id.* ¶¶ 9, 218;
- When workers returned to India, Defendants again confiscated Plaintiffs' passports and required some workers to provide financial guarantees that they would return to the U.S. to work, charging a month's wages if the workers did not comply, *id.* ¶ 215.

Through these and other acts, Defendants obtained the workers' labor by means of "physical restraint [] or threats of physical restraint," 18 U.S.C. § 1589(a)(1); "serious harm or threats of serious harm," § 1589(a)(2); "abuse or threatened abuse of law or legal process," § 1589(a)(3);[22] and "any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical

---

[22] "Serious harm" and "abuse of legal process" are defined broadly in the forced labor statute. 18 U.S.C. § 1589(c)(1)-(2).

restraint," § 1589(a)(4). SAC ¶ 166. Defendants do not dispute these facts, but instead urge the Court to weigh other disputed facts in their favor. But again, the Court must accept these well-pleaded allegations and draw all reasonable inferences in Plaintiffs' favor on a motion to dismiss.

In reality, each of these facts independently could give rise to a forced labor claim. Combined, they paint a horrific picture of an intentional scheme designed to compel the workers' continuing labor. *U.S. v. Dann*, 652 F.3d 1160, 1173 (9th Cir. 2011) ("the *sum* of these threatened harms" supported forced labor conviction) (emphasis in original). And courts have held workers stated plausible forced labor claims with allegations far less extreme than here.[23]

Beyond their mischaracterization of the breadth of the TVPA, Defendants' additional arguments for dismissal are baseless, for the following reasons.[24]

**a. Defendants' Claim That Plaintiffs "Volunteered" is a Disputed Fact Not Appropriate For Resolution Here.**

Defendants' claim that Plaintiffs are "adult males" who "voluntarily" came to

[23] *See, e.g.*, *Giles*, 31 F.4th 1139 (forced labor claim by Mexican veterinarians who did not forfeit passports, had no restrictions on travel, had cars, and went on vacations); *Magtoles v. United Staffing Registry*, 2021 WL 6197063 (E.D.N.Y. Dec. 30, 2021) (forced labor claim by Filipino nurses based on liquidated damages contract provision); *Nunag–Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 790 F.Supp.2d 1134 (C.D. Cal. 2011) (forced labor claim based on Filipino teachers' recruitment-related debts); *Antonatos v. Waraich*, 2013 WL 4523792, *4-5 (D.S.C. Aug. 27, 2013) (Panamanian physician with "six [] figure salary" stated forced labor claim).

the U.S. and sometimes returned after trips ignores the pleaded coercion scheme.

The TVPA does not require that a victim be kidnapped or coerced at the time of recruitment. Forced labor can arise where a person initially agrees to work (or travel), but the defendant later obtains his labor through threats, serious harm, abuse of legal process, or a scheme intended to cause a reasonable belief that harm will follow if the person stops working. *Dale Carmen v. Health Carousel, LLC*, 2021 WL 2476882, *9 (S.D. Ohio June 17, 2021) (it is not a defense that the worker "freely entered" the employment arrangement; "[a]n employer cannot escape TVPA liability merely because the employee 'agreed' to the term in their employment contract."); *Magtoles*, 2021 WL 6197063, *4 n.3 (rejecting defendants' argument that consent to a contract necessarily bars TVPA claims).[25]

Even if, *arguendo*, entering into an agreement to be trafficked did preclude a TVPA claim, the SAC details both the unconscionable conditions under which the workers signed the alleged contract and Defendants' disregard for the purported contract terms. SAC ¶¶ 161-168. At a minimum, because consent is an affirmative

[25] Defendants' reliance on non-TVPA contract cases to support the blackletter legal principle that signatories are presumed to have understood their contracts, D. Br. 28, makes no sense. "Courts around the country have rejected this argument and have held a plaintiff's voluntary entry into an employment agreement does not preclude a finding that they were later forced to continue providing labor." *Wen v. SanQuest, Inc.*, B, 2025 WL 276750, *4 (N.D. Tex. Jan. 23, 2025). If traffickers could absolve themselves of liability based on purported contracts showing the victims' acquiescence to the coercive terms, this would eviscerate the TVPA.

defense which Defendants must prove, *Moore v. Rubin*, 160 F.4th 271, 293 (2d Cir. 2025), it is not appropriate for dismissal at the pleadings stage. *Magtoles,* 2021 WL 6197063, *4 n.3. The alleged "contracts alone do not establish, as a factual matter, plaintiffs' consent… If anything, the contracts exemplify the disparity in bargaining power between [Defendants] and the [P]laintiffs." *Moore,* 160 F.4th at 294.[26]

Further, Defendants' claim that Plaintiffs "could have stayed in India" disregards the SAC's detailed allegations of isolation, document confiscation, surveillance, threats, and dependence once Plaintiffs were under Defendants' control in the U.S. SAC ¶¶ 7–10; 214–19. It also ignores what the workers allege they faced when they went back to India: Defendants confiscated their passports, required guarantees of return, and fined non-compliant workers. *Id.* ¶¶ 182-185, 215.

Finally, the cases Defendants reference to support their "could have stayed in India" argument are inapposite. For example, *Taylor v. Salvation Army*, 110 F.4th 1017 (7th Cir. 2024), involved forced labor claims by participants in a residential rehab program. The "walk-in" group—as opposed to the "justice-referred"

---

[26] The facts of *Moore*, a civil TVPA sex trafficking case under 18 U.S.C. §§ 1591 and 1595, are vastly different from the case at bar, and Plaintiffs here do not suggest otherwise. However, some elements of coercion—and some of the alleged defenses—are similar. Importantly, the court in *Moore* recognizes that human trafficking still can occur where the victim initially acquiesced to the relationship, departed, and later returned. *Moore*, 160 F.4th at 293-96.

group[27]—voluntarily joined the program. *Id.* at 1031. Importantly, the court did not dismiss those claims because the participants voluntarily joined, but because defendant did not—and did not intend to—prevent them from leaving early. *Id.*[28]

Whether Plaintiffs could have just left—and the reasonableness of their fear of harm—is, at a minimum, a fact question; the SAC plausibly alleges Plaintiffs reasonably believed leaving would trigger serious harm and/or restraint. SAC ¶¶ 10, 335. *Burrell*, 60 F.4th at 37–40 (coercion can exist even where the victim faces "more than a binary choice[;]" the presence of some "choice" does not categorically defeat a forced labor claim). Here, even if, arguendo, the Plaintiffs voluntarily came to the U.S. to work for Defendants—itself a fact that is in dispute—Plaintiffs have

---

[27] The court treated the justice-referred group separately for reasons irrelevant here.
[28] Defendants also cite *Arellano v. Marshalls of MA, Inc.*, 2018 WL 1120870, *4 (N.D. Ind. Feb. 2, 2018), but that case has no bearing on Plaintiffs' claims here. *Arellano* involved a janitor who the defendant did not pay for her labor and who was constructively discharged. The court denied default judgment on the forced labor claims because the defendant had not done anything to prevent the plaintiff from leaving. Whether she "voluntarily" took on her employment was not at issue. Defendants also cite *Garanin v. Lackawanna Cnty.*, 2022 WL 21770058, *7 (M.D. Pa. Feb. 4, 2022), and an out-of-context quote. In *Garanin*, the *pro se* plaintiff alleged forced labor claims arising out of the county's volunteer work release program, and the court dismissed the case. However, the Third Circuit shortly thereafter in *Burrell*, 60 F.4th at 36-41, reversed the dismissal of forced labor claims against the county arising out of the *same* work release program, and Garanin currently has a pending appeal of his dismissal based in large part on *Burrell*. *See* App. Br., *Garanin v. Lackawanna Cnty*, Dkt. 29, No. 25-1269 (3d Cir. Dec. 15, 2025).

plausibly alleged Defendants' threats of and actual serious harm, withholding of passports, and abuse of legal process prevented them from leaving.

**b. Plaintiffs Do Not and Need Not Allege Defendants Used Actual Force or Threats of Force to Obtain Forced Labor.**

Defendants claim that "Plaintiffs' allegations regarding 'force or threats of force' are conclusory." D. Br. 29. However, though Defendants present this language as a quotation, nowhere in the SAC do Plaintiffs allege Defendants used "force or threats of force." Using "force" and "threats of force" in fact are only two of several means by which a perpetrator may provide or obtain labor in violation of the forced labor statute, 18 U.S.C. § 1589(a)(1). Plaintiffs did not—and never needed to—allege force or threats of force to state a TVPA claim. *See Burrell*, 60 F.4th at 37.

With respect to threats of physical restraint and serious harm—forced labor elements Plaintiffs do allege in the SAC—Defendants cherry-pick introductory paragraphs from the SAC, while ignoring the remainder of the SAC. Further, Defendants seemingly attempt to impose a Rule 9(b) particularity pleading standard, contending Plaintiffs do not "identify which Defendant allegedly made any threat, the content of any threat, or when or where any threat was made[,]" D. Br. 29. Such exhaustive detail is not required at the pleading stage. Fed. R. Civ. P. 8; *see also Aragon v. Che Ku*, 277 F.Supp.3d 1055, 1061 n.2 (D. Minn. 2017). Moreover, the SAC *does* identify the substance of threats, including Defendants telling workers

they would be arrested if they left. SAC ¶¶ 9, 221.[29]

**c. Fines for Alleged Workplace Infractions Were Means of Coercion and Not "Legitimate Consequences," and Were Part of the Comprehensive Scheme of Forced Labor Here.**

Defendants suggest that a fine Defendants imposed on Plaintiff Mukesh Kumar for allegedly not wearing a helmet, which cut into Plaintiff Mukesh Kumar's $1.20 per hour wage rate, SAC ¶¶ 5, 209-210, was a "legitimate consequence" of his behavior. *Taylor*, 110 F.4th at 1031.[30] However, in the forced labor context, unauthorized and undisclosed deductions frequently form one of the bases for a claim. *See, e.g., Claros v. Marvin's Refrigeration Corp.*, 800 F.Supp.3d 391, 395, 401 (N.D.N.Y. 2025) (plaintiff stated forced labor claim in part based on unauthorized deductions for debt, rent, electricity, food, work phones, vehicles &

[29] Defendants only dispute the sufficiency of Plaintiffs' claim that Defendants *threatened* physical restraint; not that Defendants actually *directly employed* physical restraint to obtain the workers' labor. The actual physical restraint was obvious and is fully pleaded: Defendants housed Plaintiffs in fenced-in housing with constant security camera monitoring, within a compound that also was fenced in and secured by uniformed guards. SAC ¶¶ 7, 8, 219-220.

[30] Later in their brief, Defendants similarly contend "[t]he alleged restrictions and monitoring are consistent with reasonable security measures and cannot establish TVPA violations." But Defendants' restrictions included preventing the workers from leaving the fenced and guarded compound unaccompanied and preventing the workers from accessing their passports. SAC ¶¶ 7, 8, 186-187, 219-220. The monitoring included security cameras outside the overcrowded trailers in the fenced-in housing section of the compound. *Id.* ¶¶ 219-220. Defendants may attempt to make this baseless "reasonable security measures" argument to a jury, but it is very much a disputed fact to the extent it has even a modicum of credulity.

gas); *Lopez v. Janus Int'l Grp., Inc.*, 2024 WL 4294638, *3 (E.D. Va. Sept. 24, 2024) (judgment entered on forced labor claims in part based on threat to withhold wages, which would have made the plaintiff homeless and destitute). Here, Plaintiffs allege such deductions further reduced the meager funds available to them, deepening their financial isolation and exploitation.

In short, there is nothing "legitimate" about the threatened fines, particularly in the context of the wider forced labor scheme pleaded by Plaintiffs. The SAC alleges a comprehensive coercion scheme—not just fines for rules violations—designed to make workers believe they would suffer serious harm if they stopped working or attempted to leave.[31] Defendants largely ignore these allegations.

**d. Plaintiffs Sufficiently Plead Abuse or Threatened Abuse of Law or Legal Process.**

Defendants are wrong to suggest the only basis for Plaintiffs' allegation that Defendants threatened "abuse of legal process" is Defendants' confiscation of the workers' passports. The SAC alleges threats of police involvement and threats to use

[31] Specifically, the SAC pleads financial harm and family leverage through a pay structure that kept most wages in India—limiting access to funds in the U.S.—for the purpose of preventing escape and causing reputational harm, and family financial harm if a worker tried to flee. SAC ¶¶ 203-05. The SAC also pleads discipline through threats of being "sent home" for speaking with outside visitors. *Id.* ¶¶ 9, 218. Beyond that, the SAC pleads threats of arrest, isolation, and psychological deterioration, and threatened reputational harm and targeted recruitment of marginalized communities—facts that increase vulnerability and support the reasonableness of the perceived serious harm. *Id.* ¶¶ 7–10, 205, 214–19, 335.

law or legal process to prevent workers from leaving. For example, supervisors told workers the police would arrest them and there would be immigration consequences to prevent the workers from leaving. SAC ¶¶ 9–10. These are concrete allegations that Defendants used threats of a legal process as a coercive tool to keep workers in place—classic § 1589(3) conduct. SAC ¶ 334(e)–(f). *Burrell*, 60 F.4th at 53-54.

**e. The SAC Plausibly Pleads the Required *Mens Rea*.**

The SAC plausibly supports Plaintiffs' claim that Defendants possessed the requisite knowledge and intent to violate the TVPA, and Defendants' claims to the contrary are unavailing. SAC ¶¶ 10, 268, 301, 331-332, 334, 336-337. Regardless, whether Defendants had knowledge and intent are quintessential questions for the jury. *See, e.g., Ricchio v. McLean*, 853 F.3d 553, 557 (1st Cir. 2017) (reversing dismissal of TVPA claim where "whole body of allegations" circumstantially showed defendant's knowledge); *see also Treminio v. Crowley Mar. Corp.*, 707 F.Supp.3d 1234, 1255 (M.D. Fla. 2023); *Muhammad v. Dep't of Corr.*, 645 F.Supp.2d 299, 315 (D.N.J. 2008) ("state of mind is inherently a question of fact" for the jury), *aff'd sub nom.*, 396 F. App'x 789 (3d Cir. 2010).

### 2. Plaintiffs Plausibly Plead Document Servitude Under 18 U.S.C. §§ 1592 and 1597.

Defendants do not deny they held Plaintiffs' passports but insist that it occurred in a vacuum and thus does not violate the TVPA's prohibition on document servitude. D. Br. at 33-34. Defendants are wrong.

First, though the document servitude provision of 18 U.S.C. § 1592(a) does require that the documents be seized in the course of or with the intent to violate, *inter alia*, the forced labor or trafficking for forced labor statutes, 18 U.S.C. § 1597(a) separately prohibits confiscation or possession of passports or other immigration documents in the course of committing or with the intent to commit fraud in foreign labor contracting, § 1597(a)(1) and (2), or "in order to, without lawful authority, maintain, prevent, or restrict the labor or services of the individual." § 1597(a)(3). Therefore, Section 1997 claims can stand alone without pleading other human trafficking-related violations. *See Mendez Perez v. CJR Framing, Inc.,* 2021 WL 9184298, *5 (N.D. Tex. Jan. 22, 2021) (entering default judgment on § 1597(a)(3) claim where plaintiff did not allege other TVPA violations).

Second, Plaintiffs *also* plead Defendants confiscated the passports "in the course of and with the intent to violate" the forced labor statute, SAC ¶ 336(b), and throughout the SAC Plaintiffs describe the passport confiscation as part of the forced

labor scheme. SAC ¶¶ 7-8, 99, 183-187, 215, 217, 221, 270-271.[32]

The two cases Defendants cite—both of which were decided at the summary judgment stage—are inapposite. In *Tegete v. Maryknoll Sisters of Saint Dominic, Inc.*, 2023 WL 2504744 (S.D.N.Y. Mar. 14, 2023), the plaintiff "had access to her passport whenever she desired it and was given her passport each time she requested it." *Id.* at *2. Similarly, in *Muchira v. Al-Rawaf*, the defendants also gave the plaintiff her passport when she requested it. 850 F.3d 605, 624 (4th Cir. 2017). Those facts are not present here, let alone alleged in the SAC.

**3. The SAC Plausibly Pleads Trafficking for Forced Labor.**

The SAC pleads Defendants "knowingly recruited, transported, harbored and/or obtained" Plaintiffs for labor/services in furtherance of forced labor and related document offenses. SAC ¶ 336. Defendants claim this is insufficient because Plaintiffs "fail to allege facts showing Defendants knowingly recruited them for forced labor rather than bona fide religious work. As such, their trafficking claims

[32] Defendants spuriously suggest Plaintiffs traveled to India "for vacations," insinuating that this meant Plaintiffs had free access to their passports. D. Br. 31. However, Defendants cannot invent a fact completely absent from the SAC and then credibly claim that invented fact supports dismissal. Nowhere in the SAC do Plaintiffs suggest they went to India on "vacation." Further, as stated in the SAC, "[e]ven when the Plaintiffs and other R-1 workers were allowed to return to India, Defendants and their agents kept the workers under their control by retaining their passports." SAC ¶ 215. And Plaintiffs allege Defendants required financial guarantees of their return, with one worker actually fined 35,000 rupees (presently $480; more than a month of the workers' meager wages) when he did not return.

are derivative of their forced labor claims and fail for the same reasons." D. Br. 32. But as stated above, Plaintiffs plausibly plead the required *mens rea*.

Moreover, if a defendant violates the forced labor prohibition in 18 U.S.C. § 1589, it necessarily also violates § 1590 if it "recruits, harbors, transports, provides, or obtains by any means"[33] the worker. 18 U.S.C. § 1590(a); *Nunag–Tanedo*, 790 F.Supp.2d 1134, 1147 ("Just as Defendants' Motion as to Plaintiffs' claims under § 1589(a) fail, their Motion as to Plaintiffs' claims under § 1590 also fail."). Plaintiffs' SAC alleges that Defendants, in addition to providing and obtaining Plaintiffs' labor in violation of § 1589, transported and recruited them. SAC ¶¶ 1, 13, 114, 156-188, 336. Plaintiffs have therefore also adequately alleged that Defendants trafficked them for forced labor in violation of 18 U.S.C. § 1590.[34]

---

[33] "[B]y any means" is a "catchall provision" that encompasses any manner by which a defendant obtains a worker's forced labor. *Baxla v. Chaudhri*, 225 F.Supp.3d 588, 593-94 (E.D. Va. 2016).

[34] Even if the Court somehow finds that Plaintiffs have not sufficiently stated a claim under § 1589, it may still allow § 1590 claims to proceed, "which is most obviously read as requiring only intent to produce the result described[.]" *Ricchio*, 853 F.3d at 558. In other words, for purposes of § 1590, "the objective of forced labor, forced services, or the intended trafficking need not be satisfied for liability to attach[.]" *Id.* Plaintiffs allege Defendants used agents and contractors to recruit workers in India for employment at the BAPS temples in the U.S., required them to sign BAPS's imposed "agreements" in India, and transported them to the U.S. SAC ¶¶ 156-188. Those allegations plausibly plead a § 1590 violation (and, at minimum, participation in a venture that recruited/obtained labor through forced-labor means).

**C. Plaintiffs Plausibly Plead Section 1981 Claims.**

Plaintiffs have plausibly pleaded that Defendants intentionally discriminated against them (and other members of the Class) based on their ancestry and ethnicity—i.e., their caste and tribe—in violation of Section 1981. Accordingly, Defendants' motion to dismiss this claim must be denied.

First, Plaintiffs have plausibly alleged that they are all members of a racial/ethnic minority protected by Section 1981 because they are all "members of the Scheduled Castes, also known as Dalit" or members of "the Scheduled Tribes, also known as Adivasi." *See* SAC ¶ 394; *id.* ¶¶ 26, 28, 29, 36, 46 (Plaintiffs Mukesh Kumar, Laal, Niranjan, Mahendra Kumar, & Rama Ram are Dalit); *id.* ¶¶ 49, 50, 51, 52 (Plaintiffs Ramesh Kumar, Deva Ram, & Rupa Ram are Adivasi). It is settled that Section 1981 also protects "identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics. Such discrimination is racial discrimination that Congress intended § 1981 to forbid, whether or not it would be classified as racial in terms of modern scientific theory."[35] *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987).

---

[35] For example, the Supreme Court in *Saint Francis College* noted that "Encyclopedias of the 19th century also described race in terms of ethnic groups" including the Romani, and that congressional debate over 1981 referred to the Romani as a race. *See* 481 U.S. at 611.

Defendants selectively quote the SAC in characterizing caste as a "more akin to social class than the racial classifications that § 1981 was designed to address." D. Br. 48. But that is a factual dispute. The SAC cites two reports and an article that explain how caste and tribe is rooted in ancestry and ethnic characteristics:

- "A person is considered a member of the caste into which he or she is born and remains within that caste until death . . . . Dalits endure near complete social ostracization. 'Untouchables' may not cross the line dividing their part of the village from that occupied by higher castes. They may not use the same wells, visit the same temples, or drink from the same cups in tea stalls. Dalit children are frequently made to sit at the back of classrooms."[36]
- "The caste system categorizes Hindus at birth, defining their place in society, what jobs they can do and who they can marry . . . . Adivasis are indigenous Indians who have been socially and economically marginalized for centuries."[37]
- "Adivasis, as their name reflects, are the earliest inhabitants of the subcontinent and once inhabited much larger areas than they do at present . . . . Adivasis continue to face prejudice and often violence from mainstream Indian society." [38]

The SAC thus pleads that caste and tribe are passed down by birth and are "ancestry or ethnic characteristics" protected from discrimination by Section 1981. That

[36] Human Rights Watch, *Caste Discrimination: A Global Concern* (2001), https://www.hrw.org/reports/2001/globalcaste/caste0801-03.htm (last visited Feb. 1, 2026) (cited in SAC ¶ 11 n.3) .
[37] Prilali Sur, *Under India's caste system, Dalits are considered untouchable. The coronavirus is intensifying that slur*, CNN.com (Apr. 16, 2020), https://www.cnn.com/2020/04/15/asia/india-coronavirus-lower-castes-hnk-intl/index.html (last visited Feb. 9, 2026) (cited in SAC ¶ 11, n.3).
[38]Minority Rights Grp., *Adivasis*, https://minorityrights.org/minorities/adivasis-2/ (visited Feb. 1, 2026) (cited in SAC ¶ 11 n.4).

allegation, on a 12(b)(6) motion, must be accepted as true. Discovery should proceed on this issue, and Defendants' insinuations to the contrary should be rejected.[39]

Finally, Plaintiffs have plausibly alleged that they were subject to intentional discrimination on the basis of their caste or tribe, including as follows:

- Plaintiffs are Dalit or Adivasi. SAC ¶ 394.
- Defendants intentionally recruited Plaintiffs and other Dalit and Adivasi workers because they knew they were vulnerable to exploitation. *Id.* ¶ 11.
- "At the Robbinsville temple and elsewhere, temple leadership did what they could to remind these marginalized workers of their place in the social hierarchy. Defendant Swami Prasanand, for example, called the workers "worms,"[40] thus exacerbating the psychological coercion the workers experienced." *Id.*
- Defendants intentionally recruited Dalit people from the Adivasi tribes, and people from other marginalized groups based on their ancestry and ethnicity because Defendants knew these workers suffered from rampant discrimination and therefore had very limited economic opportunities, access to services, and government protection in India. Defendants essentially weaponized India's caste system, using it to coerce the Plaintiffs and other R-1 workers to work for substandard pay under abysmal conditions in New Jersey. *Id.* ¶ 269.
- The challenged practices originated with the common recruitment of workers from marginalized castes and tribes in India to work in the U.S. for long hours and illegally low wages. *Id.* ¶ 286.

---

[39] And as recent scholarship has documented, Section 1981 was crafted with India's caste system in mind. *See* Kevin Brown et al., *Distinguishing the Caste-Race Debate in the United States from South Asia,* 66 ARIZ. L. REV. 915, 945–962 (Winter 2024); Kevin Brown *et al*., *Does U.S. Federal Employment Law Now Cover Caste Discrimination Based on Untouchability?*, 46 N.Y.U. REV. OF L. & SOC. CHANGE 117, 137–52 (2022).

[40] Defendants claim that "worms" was in fact religious praise, unless it was not. D. Br. 48-49. This is just one more effort to contort religious texts to excuse cruelty.

Defendants attempt to characterize this as "at most arguably suggest[ing] exploitation of economic vulnerability." But the point in the SAC is that Defendants' scheme of forced labor was intentionally imposed on these workers *because of* their status as Dalit or Adivasi, i.e., because of their ancestry and ethnic characteristics. In any event, Defendants at most raise another factual issue that is inappropriate for resolution on a motion to dismiss.

**D. Plaintiffs' RICO Claims Are Adequately Pleaded.**

Defendants contend Plaintiffs' RICO claims should fail because (1) they did not plead association-of-fact enterprises distinct from the Defendants; and (2) they did not sufficiently plead predicate acts. Both arguments are baseless.

**1. Plaintiffs Sufficiently Plead the RICO Enterprises.**

Plaintiffs plausibly plead four RICO enterprises: three association-of-fact enterprises and one legal entity enterprise.[41] At this stage, the Court asks whether the SAC plausibly alleges an enterprise with the structural attributes identified in *Boyle v. U.S.*, 556 U.S. 938, 946 (2009): (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit the associates to pursue the enterprise's purpose. *Id.*; *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d

---

[41] Plaintiffs have attached as Appendix. A summary charts showing the members, associated Defendants, and purpose of each RICO enterprise (hereafter, "RICO Summ.").

300, 369–70 (3d Cir. 2010).[42] There is not a requirement to plead a hierarchy, "chain of command," formal meetings, an organizational chart, or other evidentiary details. *Boyle*, 556 U.S. at 948. Nor must Plaintiffs plead the enterprise as "separate" from what it does; courts recognize that association-in-fact enterprises are "often more readily proven by what [the enterprise] does." *Id.*, 556 U.S. at 951*; Ins. Brokerage*, 618 F.3d at 366–67 (discussing *Boyle*).

Defendants incorrectly claim Plaintiffs merely "re-shuffle Defendants into four alleged RICO enterprises…." and that each enterprise had the same "common purpose." D. Br. 37. However, the enterprises have different characteristics and—for the association-in-fact enterprises—different members. *See* RICO Summ. Further, Enterprises I and II have the same purpose centering on the Robbinsville temple, but Enterprises III and IV have distinct purposes: Enterprise III centers on the four non-Robbinsville temples while Enterprise IV pulls in all five temples,

[42] Defendants cite *Ins. Brokerage* to suggest Plaintiffs have not sufficiently alleged the elements of the enterprises. However, *Ins. Brokerage*—a sweeping, procedurally complex antitrust conspiracy and bid rigging case involving sophisticated parties with detailed records pertaining to the claims, 618 F.3d at 308-11—found the plaintiff *had* sufficiently pleaded two enterprises. *Id*. On appeal, the Third Circuit agreed the plaintiffs had not sufficiently pled one enterprise, i*d.* at 374, but also found the plaintiffs *had* sufficiently pled a second enterprise with a hub-and-spoke configuration, *id.* at 378-79, and a third enterprise consisting of a trade organization. *Id.* at 379-83. The connections between the members of the *Ins. Brokerage* hub-and-spoke enterprise were more attenuated and divergent than the closely connected members in the association-of-fact enterprises Plaintiffs name here.

including Robbinsville. *Id.* Therefore, what Defendants convey as ramshackle enterprise pleading is the opposite. Plaintiffs have pleaded the different enterprises intentionally to capture their different structures and purposes.

Additionally, Defendants do not appear to dispute that Plaintiffs have sufficiently pleaded the required structural attributes of the legal entity enterprise (RICO Enterprise IV), which, as Defendants correctly note, can be established "without great difficulty." D. Br. 35; *see also* RICO Summ. at 4. Therefore, Plaintiffs will focus—as Defendants did—on the association-of-fact enterprises (RICO Enterprises I-III).[43]

With respect to the association-of-fact enterprises, Plaintiffs' pleading in the SAC is sufficient. Because the details of each attribute likely will not be known until discovery has taken place, it is not necessary under Rule 8 to plead specific facts supporting each attribute. *See Pacheco v. Golden Living Ctr.-Summit*, 2011 WL 744656, *3-4 (M.D. Pa. Feb. 23, 2011); *see also Aurandt v. Brown*, 2017 WL

[43] Plaintiffs recognize that Enterprise IV lists Defendant BAPS U.S. both as the enterprise itself and a Defendant "person" associated with the enterprise, which may not satisfy the "distinctiveness" requirement. Plaintiffs intended to exclude BAPS U.S. from the Defendant "persons" for Enterprise IV and would seek leave to amend to correct this if dismissed on this basis. *See Ins. Brokerage*, 618 F.3d at 308-11 (district court twice granted defendants' motions to dismiss without prejudice because plaintiffs had not met enterprise-related pleading requirements, but court granted leave to amend).

1215451, *4-5 (W.D. Pa. March 31, 2017) (plaintiff sufficiently alleged an enterprise by describing the entities involved, their relationships, and their common purpose, though the plaintiff did not specify each defendant's role in detail); *Wallace v. Powell*, 2010 WL 3398995, *13 (W.D. Pa. Aug. 24, 2010) (finding it sufficient to allege the existence of an association-in-fact enterprise without proving its structure or separation from the racketeering activity). Here, the SAC does more than "simply identify the allegedly associated components." *See* RICO Summ.

The RICO enterprise purposes, *see* RICO Summ., meet the *Boyle* pleading requirement: a coordinated venture pursued by multiple actors over time. *Boyle*, 556 U.S. at 946; *Ins. Brokerage*, 618 F.3d at 369–70. Defendants' insistence that this purpose is "indistinguishable" from each Defendant's "own affairs" misstates the enterprise inquiry. The question is not if each Defendant benefited, but whether the SAC plausibly pleads that multiple Defendants acted together as a continuing unit to carry out the shared scheme. *Boyle*, 556 U.S. at 946; *Ins. Brokerage*, 618 F.3d at 369–70 (enterprise plausibly pled as allegations support "acting in concert" as a continuing unit). Here it does, tying U.S. and international individuals and entities (who controlled recruitment processes or provided oversight functions) to local individuals and entities (who owned and operated the properties and benefitted from

the labor) for unified objectives across multiple sites and years. *See* RICO Summ.[44]

**2. Plaintiffs Sufficiently Plead the RICO Predicate Acts.**

Defendants contend the SAC fails to show Defendants, through the enterprises, committed the underlying predicate acts. This is wrong.

First, as detailed above, Plaintiffs more than sufficiently plead their trafficking-related predicate acts. Second, Plaintiffs plead the fraud-related predicate acts with the required Rule 9(b) particularity. At this stage, Rule 9(b) does not convert the particularity requirement into a demand for evidentiary proof. Plaintiffs may plead fraud with particularity by alleging the "who, what, when, where, and how," or "otherwise inject precision or some measure of substantiation into a fraud allegation" sufficient to give notice. *Alpizar-Fallas v. Favero*, 908 F.3d 910, 919 (3d Cir. 2018). Further, the Rule 9(b) pleading requirements can be relaxed if "requisite factual information is peculiarly within the defendant's knowledge or control… [or] when the transactions are numerous and take place over an extended period of time…." *Cannon v. Ashburn Corp.*, 2016 WL 7130913, *5 (D.N.J. Dec. 7, 2016)

[44] Defendants' suggestion that each enterprise is "simply the same 'person' by a different name," Def. Br. at 36 (quoting *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 162 (2001)), makes no sense. Throughout their brief, Defendants have argued that, because each Defendant is separate and distinct from each other, Plaintiffs have not shown each Defendant's liability as an employer, trafficker, or fraudster. However, in their attempt to show Plaintiffs failed to show distinctiveness, Defendants take the opposite position. They cannot have it both ways.

(collecting cases; internal citations omitted). Here, the SAC's allegations include detailed descriptions of the scheme and the visa process, as well as a table of visa information tied to individual Plaintiffs and time periods. SAC ¶¶ 145–55. Though the SAC provides, for example, date ranges rather than specific dates, granular details—such as R-1 visa application dates and the application signatories —are solely in Defendants' possession. Plaintiffs' pleading of predicate acts is sufficient.[45]

### E. Plaintiff Plausibly Plead Claims for Quasi-Contract Remedies

Plaintiffs adequately plead their quasi-contract claims. Regarding unjust enrichment, Plaintiffs allege that Defendants received the benefits of Plaintiffs' labor at the expense of Plaintiffs' efforts without providing substantial payment. *Id.* ¶¶ 400-402. It is clear from the SAC as a whole that the circumstances would make it unjust for Defendants to retain the benefit of Plaintiffs' work. Plaintiffs further specify that Defendants obtained Plaintiffs' work by fraud, duress, and/or taking advantage of Plaintiffs, *id.* ¶ 402, as well as the manner of the fraud and duress,

---

[45] Defendants only briefly address Plaintiffs' RICO conspiracy claims under 18 U.S.C. § 1962(d). But Defendants suggest that, to meet their pleading obligations for a conspiracy, Plaintiffs must sufficiently plead *completion* of the criminal endeavor. Def. Br. at 41. That is wrong. *See Salinas v. U.S.*, 522 U.S. 52 (1997); *Smith v. Berg*, 247 F.3d 532, 538 (3d Cir. 2001). This becomes important only if the Court were to determine that Plaintiffs do not sufficiently plead § 1962(c) violations against some (or any) Defendant. By relying on a one-sentence incorrect legal conclusion as their sole basis for dismissal of the RICO conspiracy claims, Defendants effectively have abandoned their argument and the claims must survive.

including financial manipulation, threats, isolation, and intimidation. *Id.* ¶¶ 7, 11, 12, 205, 217, 218, 271, 246, 239, *et. seq*.[46] Regarding quantum meruit, Plaintiffs allege they performed services for Defendants in good faith, who accepted those services, with the expectation of reasonable compensation for those services, and were thus damaged in that amount. *Id.* ¶¶ 407-417.

## III. The Court Should Reject Defendants' "Hail Mary" Bid to Compel Arbitration After Repeatedly Making Use of the Civil Court System.

### A. By Invoking the TVPA's Civil Lawsuit Stay Provision and Moving for Adjudications on the Merits, Defendants Have Waived Arbitration.

Defendants assert in the alternative that alleged "volunteer agreements" require that the Court compel this case to arbitration under the Federal Arbitration Act ("FAA"). D. Br. 58. But Defendants waived the right to arbitrate by (1) invoking the TVPA's civil lawsuit stay provision; and (2) seeking merits rulings here.

In weighing if a party has waived arbitration, courts cannot "tilt the playing field in favor of (or against) arbitration" but must apply the usual test of waiver. *Morgan v. Sundance, Inc.*, 596 U.S. 411, 419 (2022).[47] "[W]aiver occurs where a party has intentionally relinquished or abandoned a known right." *White v. Samsung Elecs.*, 61 F.4th 334, 339 (3d Cir. 2023) (cleaned up). "In analyzing whether waiver

---

[46] This Circuit recognizes that violations of the TVPA or FLSA can form the basis of claims for unjust enrichment. *Burrell*, 60 F.4th at 50.

[47] *Morgan* overruled this Circuit's prior prejudice test articulated in *Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912 (3d Cir. 1992).

has occurred, a 'court focuses on the actions of the p[arty] who held the right' and is informed by the 'circumstances and context of each case'" to assess if the party "acted inconsistently with an intent to assert its right to arbitrate." *Id.* (citations omitted).

Defendants' "litigation actions here evince a preference for litigation over arbitration." *Id.* at 340. Here, Defendants *never* asserted a right to arbitrate, but instead invoked the TVPA's mandatory civil stay, 18 U.S.C. § 1595(b)(1). ECF No. 21. Defendants took advantage of the stay,[48] keeping this case in this Court. Both before and during the stay, Defendants never invoked a right to arbitrate in communications with the Court or counsel—further indicating waiver.[49]

Defendants' filing of this motion to dismiss all claims on the merits also indicates waiver. This Circuit has held that defendants who "clearly sought to have this case dismissed by a court on the merits" had demonstrated their intent to litigate instead of arbitrate. *White*, 61 F.4th at 340. As in *White*, Defendants seek dismissal of the claims on their merits, not mere procedural grounds. *See id.* at 340 n.27. By

[48]The stay provision applies to civil actions in courts, not arbitrations: "Any civil action filed under subsection (a) shall be stayed during the pendency of any criminal action arising out of the same occurrence[.]" § 1595(b)(1).

[49] *Valli v. Avis Budget Grp.*, 162 F.4th 396 (3d Cir. 2025), is not to the contrary. There, the plaintiffs were not subject to arbitration; only after a class was certified was the motion relevant, and moving earlier would have been futile. *Id.* at 411–13. Here, nothing would have made it futile for Defendants to so move at the start of this case.

seeking arbitration in the alternative—i.e., only if they cannot get all claims dismissed—Defendants seek merits rulings and waive arbitration. *See In re Pharmacy Ben. Mgrs. Antitrust Litig.*, 700 F.3d 109, 118 (3d Cir. 2012) (defendant "directly contested the merits," supporting finding waiver); *Nowak v. Thoroughbred Servs.*, 2021 WL 5937726, *7 (E.D. Pa. Dec. 16, 2021) (multiple efforts to dismiss claims "weigh[] in favor of a finding of waiver").[50]

### B. Defendants Fail to Prove the Existence of a Valid Agreement to Arbitrate With a Clear and Unambiguous Waiver of Rights.

Defendants have also not met their burden to show a valid arbitration provision exists. Under the FAA, a court must determine that "a valid agreement to arbitrate exists[,]" *Kirkleis v. Dickie*, 560 F.3d 156, 160 (3d Cir. 2009), under state law—and the movant bears the burden. 9 U.S.C. § 2; *Merrill Lynch v. Cantone Rsch., Inc.*, 427 N.J. Super. 45, 59 (App. Div. 2012) ("As the proponent of arbitration, defendants have the burden to establish the existence of an agreement to arbitrate…"). If the complaint and its supporting documents are unclear as to whether parties agreed to arbitrate, a "restricted inquiry into factual issues is necessary," and the motion "is judged under a summary judgment standard" if renewed later. *Singh v. Uber*, 939 F.3d 210, 216 (3d Cir. 2019).

---

[50] While some courts have found no waiver where a motion on the merits was filed concurrently with a motion to compel, those cases almost all universally predate *Morgan* and were improperly influenced by a presumption against finding waiver.

Defendants have failed to authenticate the "Agreements"[51] and Plaintiffs have put their validity at issue, pleading: (1) workers had to sign "unilaterally drafted and imposed" "documents in connection with their recruitment[;]" (2) "none of the named Plaintiffs read or understand English," and (3) "Workers were not given any time to review the 'agreements' – even the Hindi versions – but were just told to quickly sign in multiple places."[52] SAC ¶¶ 161–64. The motion to compel must therefore be denied, subject to further discovery. *Singh*, 939 F.3d at 216.

Second, Defendants have not shown the provisions are valid. In this state, waiver-of-rights provisions are not mutually assented to if they do not "reflect that [the party] has agreed clearly and unambiguously' to its terms."[53] *Atalese v. U.S. Legal Servs.*, 219 N.J. 430, 443 (2014). For assent, waiver-of-rights language "must

---

[51] Counsel avers these are "true and correct copies" but states no personal knowledge or other basis for so declaring. Typically, the movant offers an evidentiary basis for the purported arbitration provision to satisfy their burden.

[52] The "Agreements" submitted are in English and include an "Interpreter's Statement" from a BAPS employee, which claims he "read the entire Volunteer Agreement together with its exhibits, to the Volunteer in the above-mentioned language, and the Volunteer has understood the entire agreement and all provisions contained therein." Even if true, this does not indicate who appeared or if they agreed to the terms, and there remains a factual dispute as to whether a *valid* agreement exists, SAC ¶¶ 161–64. And it defies logic that Plaintiffs understood the arbitration provision, whether or not it was translated. *See Vidal v. Advanced Care Staffing*, 2023 WL 2783251, *10 n.8 (E.D.N.Y. Apr. 4, 2023) (foreign worker unfamiliar with U.S. law unlikely to understand arbitration terms).

[53] This rule is not specific to arbitration; it is part of analyzing if a valid contract has been formed. *See Kernahan v. Home Warranty Admin.*, 236 N.J. 301, 319 (2019).

be clear and unambiguous—that is, the parties must know that there is a distinction between resolving a dispute in arbitration and in a judicial forum." *Id.* at 445.

Here, the provisions contain *no reference* to a waiver of statutory or constitutional rights, but only to arbitration. *See, e.g.*, Ex. 2, at 8 ¶ 26. By contrast, New Jersey only enforces clauses that explicitly state "that by choosing arbitration one gives up the 'time-honored right to sue.'" *Atalese*, 219 N.J. at 445–46 (collecting examples). Defendants do not argue otherwise but claim that is irrelevant because these are "volunteer" agreements.[54] D. Br. 59–60. The Court need not decide this factual dispute now, especially as the "Agreements" have the indicia of an employment contract, and Plaintiffs plausibly allege Defendants engaged in a forced labor scheme by holding out Plaintiffs as "religious volunteers" to obtain R-1 visas.[55]

---

[54] Defendants claim that since New Jersey has (allegedly) "not 'definitively determined' whether a heightened waiver rule applies to volunteer agreements[,]" "the FAA mandates any ambiguity be resolved in favor of arbitration." D. Br. 60. That is wrong. First, as the Supreme Court clarified again in *Morgan*, there is no policy "favoring arbitration." 596 U.S. at 412. Second, even if a "federal policy favoring arbitration" has any continued application, it does not affect formation disputes. *Kirkleis*, 560 F.3d at 160 ("presumption in favor of arbitration does not apply to the determination of whether there is a valid agreement to arbitrate[.]").

[55] Defendants also cannot insist these are "purely volunteer contract[s]" *and* contracts "evidencing a transaction involving commerce" subject to the FAA, 9 U.S.C. § 2 (FAA applies to "a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction"); D. Br. 58 (invoking FAA as basis to compel arbitration).

## IV. Leave to Amend Any Pleading Deficiencies Should Be Freely Granted.

To the extent that the Court identifies pleading deficiencies as to any claim, dismissal should be without prejudice, and Plaintiffs should be granted leave to amend to cure such deficiencies.[56] *See Choate v. Breaux*, 2012 WL 4103934, *3 (M.D. Pa. Aug. 31, 2012) ("If the complaint is merely deficient as pleaded, the court should grant leave to amend before dismissal with prejudice.") (citing *Shane v. Fauver*, 213 F.3d 113, 116–17 (3d Cir. 2000)). Leave to amend is warranted because: (1) the SAC is effectively the first amended pleading, as it was only re-amended to correct misspellings, ECF No. 25; (2) Defendants never used this Court's pre-motion procedures to narrow disputes to those that could not be cured by amendment, Castner Indiv. R. & Proc. Pt. II (at "Pre-Motion Conference"); and (3) justice requires it given the gravity of Plaintiffs' labor trafficking claims. Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires.").

## CONCLUSION

For the reasons set forth above, the Court should deny Defendants' motion in its entirety.

Respectfully submitted,

DATED: New York, NY
February 9, 2026

/s/ Hugh Baran

---

[56] While Plaintiffs lack space to identify all potential facts they could add, they note many have been identified herein.

Hugh Baran (he/him)
Katherine Wutchiett* (she/her)
KATZ BANKS KUMIN LLP
111 Broadway, Suite 1403
New York, NY 11101
(646) 759-4501
baran@katzbanks.com
wutchiett@katzbanks.com
(*pro hac vice motion to be filed)

Patricia Kakalec
KAKALEC LAW PLLC
80 Broad Street, Suite 703
New York, NY 10004
(212) 705-8730
Patricia@KakalecLaw.com
*(admitted pro hac vice)*

Daniel Werner
RADFORD SCOTT LLP
125 Clairemont Ave., Suite 380
Decatur, Georgia 30030
(678) 271-0300
dwerner@radfordscott.com
*(admitted pro hac vice)*

Andrew Glenn
JAFFE GLENN LAW GROUP
300 Carnegie Center, Ste. 150300
Princeton, NJ 08540
(201) 431-8069
aglenn@jaffeglenn.com

*Attorneys for Plaintiffs*

# Appendix A

## RICO Enterprise Summary Charts

## RICO Enterprise I

| Enterprise Structural Attributes | | SAC |
|---|---|---|
| **Members** | BAPS Swaminarayan Sanstha, BAPS Mercer, BAPS Robbinsville, BAPS Fellowship, BAPS Atlanta, BAPS Chino Hills, BAPS Development, BAPS Houston, BAPS Chicago, BAPS India | ¶ 129 |
| **Associated Defendants** | BAPS Swaminarayan Sanstha, BAPS Mercer, BAPS Robbinsville, BAPS Fellowship, BAPS Atlanta, BAPS Chino Hills, BAPS Development, BAPS Houston, BAPS Chicago, BAPS India, Bharat Patel, Pankaj Patel, Kanu Patel, Rakesh Patel, Swami Prasanand, Harshad Chavda | ¶ 130 |
| **Inter-member links** | The enterprise members, except BAPS India, share the 81 Suttons Lane, Piscataway, NJ address. | ¶¶ 55, 57, 62, 64, 66, 73, 80, 86, 91. |
| | The for-profit LLC enterprise members own the temple properties where the Plaintiffs worked. | ¶¶ 58, 63, 69, 71, 75, 78, 83, 87-89, 93-96. |
| | The enterprise members participated in the violations of law at issue in the lawsuit. | ¶¶ 56, 59, 72, 79, 85, 90, 97, 99. |
| | BAPS Fellowship is a member or manager of BAPS Robbinsville. | ¶ 64 |
| | BAPS Fellowship is a manager or member of BAPS Chino Hills. | ¶ 76 |
| | BAPS Mercer obtained permits and other government approvals for the construction work Plaintiffs performed at the Robbinsville temple. | ¶ 60 |
| | BAPS Swaminarayan Sanstha, BAPS India, and BAPS Fellowship were employers or joint employers of Plaintiffs at each temple. | ¶¶ 119-126 |
| | BAPS Robbinsville, BAPS Atlanta, BAPS Chino Hills, BAPS Development, BAPS Houston, and BAPS Chicago were employers or joint employers of Plaintiffs at the respective associated temples. | ¶¶ 119-126 |
| | BAPS Swaminarayan Sanstha served as the Plaintiffs' R-1 visa sponsor, while BAPS India submitted documents for the R-1 visa applications and seized Plaintiffs' passports in India. | ¶¶ 56, 99 |
| **Purpose** | To recruit, contract, transport, and employ foreign workers to work in the construction of the BAPS Robbinsville temple. | ¶ 346 |

[Continued on following page]

## RICO Enterprise II

| Enterprise Structural Attributes | | | SAC |
|---|---|---|---|
| **Members** | BAPS Swaminarayan Sanstha<br>BAPS Mercer<br>BAPS Robbinsville<br>BAPS Fellowship<br>BAPS Atlanta<br>BAPS Chino Hills<br>BAPS Development<br>BAPS Houston<br>BAPS Chicago<br>BAPS India<br>BAPS Atlantic City<br>BAPS Care International<br>BAPS Charities | BAPS Cherry Hill<br>BAPS Clifton<br>BAPS Delaware<br>BAPS East Windsor<br>BAPS Edison<br>BAPS Endowment<br>BAPS Hankins<br>BAPS Hospitality<br>BAPS Independence<br>BAPS Jersey City<br>BAPS Northeast Development<br>BAPS Shayona<br>BAPS – Northeast | ¶ 131 |
| **Defendants associated with enterprise** | BAPS Swaminarayan Sanstha<br>BAPS Mercer<br>BAPS Robbinsville<br>BAPS Fellowship<br>BAPS Atlanta<br>BAPS Chino Hills<br>BAPS Development<br>BAPS Houston | BAPS Chicago<br>BAPS India<br>Bharat Patel<br>Pankaj Patel<br>Kanu Patel<br>Rakesh Patel<br>Swami Prasanand<br>Harshad Chavda | ¶ 132 |
| **Inter-member links** | *See* RICO Enterprise I chart, *supra*. | | |
| **Enterprise purpose** | To recruit, contract, transport, and employ foreign workers to work in the construction of the BAPS Robbinsville temple. | | ¶ 346 |

[Continued on following page]

## RICO Enterprise III

| Enterprise Structural Attributes | | SAC |
|---|---|---|
| **Defendants associated with enterprise** | BAPS Swaminarayan Sanstha<br>BAPS India<br>Rakesh Patel | ¶ 134 |
| **Inter-member links** | The enterprise members, except BAPS India, share the 81 Suttons Lane, Piscataway, NJ address SAC | ¶¶ 55, 66, 73, 80, 86, 91. |
| | The for-profit LLC enterprise members own the temple properties where the Plaintiffs worked. | ¶¶ 69, 71, 75, 78, 83, 87-89, 93-96. |
| | BAPS Swaminarayan Sanstha, BAPS India, BAPS Atlanta, BAPS Chino Hills, BAPS Development, BAPS Houston, and BAPS Chicago were employers or joint employers of Plaintiffs at the respective associated temples. | ¶¶ 119-126. |
| | BAPS Swaminarayan Sanstha served as the Plaintiffs' R-1 visa sponsor, while BAPS India submitted documents for the R-1 visa applications and seized Plaintiffs' passports in India. | ¶ 56, 99. |
| **Enterprise purpose** | To recruit, contract, transport, and employ foreign workers to work in the construction of the BAPS Los Angeles, BAPS Houston, BAPS Chicago, and BAPS Atlanta temples. | ¶ 347. |

## RICO Enterprise IV

| Enterprise Structural Attributes | | SAC |
|---|---|---|
| **Members** | BAPS Swaminarayan Sanstha is a legal-entity enterprise and therefore does not have members. | ¶ 135 |
| **Defendants associated with enterprise** | BAPS Swaminarayan Sanstha<br>BAPS Mercer<br>BAPS Robbinsville<br>BAPS Fellowship<br>BAPS Atlanta<br>BAPS Chino Hills<br>BAPS Development<br>BAPS Houston<br>BAPS Chicago<br>BAPS India<br>Bharat Patel<br>Pankaj Patel<br>Kanu Patel<br>Rakesh Patel<br>Swami Prasanand<br>Harshad Chavda | ¶ 136 |
| **Inter-member links** | BAPS Swaminarayan Sanstha is a legal-entity enterprise and therefore does not have members. | ¶ 135 |
| **Enterprise purpose** | To recruit, contract, transport, and employ foreign workers to work in the construction of the BAPS Robbinsville, BAPS Los Angeles, BAPS Houston, BAPS Chicago, and BAPS Atlanta temples. | ¶ 348 |